Thomas BURKA, Eugene Avent, Frank Doe, Tracey Devlin and Fitzgerald Cumberbatch, Plaintiffs,

James Salazar, Plaintiff–Intervenor,

v.

NEW YORK CITY TRANSIT AUTHORITY, et al., Defendants.

John FA, Plaintiff,

v.

NEW YORK CITY TRANSIT AUTHORITY and David L. Gunn, individually and in his official capacity as President of the New York City Transit Authority, Defendants.

TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, LOCAL 100, and Sonny Hall, as President of Transport Workers Union of America, AFL–CIO, Local 100, Plaintiffs,

v.

NEW YORK CITY TRANSIT AUTHORITY, Manhattan and Bronx Surface Transit Operating Authority and David Gunn, as President, New York City Transit Authority, Defendants.

Nos. 85 Civ. 5751 (GLG), 86 Civ. 6535 (GLG) and 86 Civ. 7427 (GLG).

United States District Court, S.D. New York.

Feb. 1, 1988.

Legal Action Center of the City of New York, Inc., New York City, for plaintiffs Thomas Burka, Eugene Avent, Frank Doe, Tracey Devlin, and Fitzgerald Cumberbatch; Margaret K. Brooks, Noran J. Camp, Catherine H. O'Neill and Ellen M. Weber, of counsel.

Gladstein, Reif & Meginniss, Brooklyn, N.Y., for plaintiff-intervenor James Salazar; James Reif, of counsel.

Albert C. Cosenza, Vice President and Gen. Counsel New York City Transit Authority, Brooklyn, N.Y., for defendants, New York City Transit Authority, et al.; Eugene Freidus and Gloria E. Colon, of counsel.

South Brooklyn Legal Services, Brooklyn, N.Y. (Jane Greengold Stevens, of counsel), Kramer, Levin, Nessen, Kamin & Frankel, New York City (Stephen N. Young, of counsel), for plaintiff John Fa.

O'Donnell & Schwartz, New York City, for plaintiffs Transport Workers Union of America, AFL–CIO, Local 100, and Sonny Hall, as President of Transport Workers Union of America, AFL–CIO, Local 100; David B. Rosen, of counsel.

## OPINION

GOETTEL, District Judge:

The problem of drug abuse in the United States has long ceased to be a matter of individual concern. It has become a serious problem in the workplace. It has been estimated that the total economic loss at-

tributable to drug and alcohol abuse may be as much as one hundred billion dollars a year, and that figure does not account for social costs.[1] Not surprisingly, approximately one-third of all United States businesses and governmental entities have resorted to employee drug-testing programs.[2] The percentages vary according to industry, but ninety-one percent of the public utilities and eighty-one percent of the transportation industries employ testing.[3]

The need for such tests with respect to transportation workers is supported by a number of sources. The chairman of the National Transportation Safety Board suggested last year that one-half of all rapid transit accidents investigated in recent years have been due to drugs, although no actual statistics were cited.[4] Federal Railroad Administrator John Riley has said that traces of drugs or alcohol were found in 5% of United States railroad employees tested following train accidents during 1986.[5] Public interest in this problem was heightened by the January 4, 1987 collision near Baltimore involving a Conrail freight locomotive and an Amtrak passenger train which killed sixteen people. Tests indicated traces of marijuana in the blood and urine of the engineer and a crewman on the Conrail train.[6]

The testing of transportation workers for drugs has produced vigorous opposition from some of the employees and their unions, oftentimes resulting in constitutional and other challenges. We have before us three such actions brought by and on behalf of present, former, and prospective employees of the defendant New York City Transit Authority (the "TA") challenging

that agency's drug-testing policy.[7] We are now asked to rule on various motions and crossmotions for dismissal or summary judgment in these related cases.

## I. FACTS

The TA policy compels employees and job applicants to submit to urinalysis tests for detection of narcotics, including marijuana, at various times and under a number of circumstances during their employment with the TA. The TA originally tested a single urine sample, employing a procedure known as enzyme multiplied immunoassay technique ("EMIT"). For the last three years, it has been taking two samples and using a second test known as bonded phase absorption with thin layer chromatography.[8]

TA employees perform a wide variety of jobs, and include bus and train operators, mechanics, conductors, subway tower operators, maintenance and cleaning people, and numerous clerical employees. All employees are required to submit to drug testing: (1) as part of routine, periodic physical examinations; (2) following extended absence or suspension; (3) during physical examinations consequent to promotion; (4) following on-duty incidents; (5) at any time if a controlled substance had been identified in a prior test; or (6) upon suspicion of a supervisor that an employee is impaired as a result of drug use. Penalties vary with the employee's length of service and service record, but employees, such as plaintiffs, whose tests revealed marijuana use could be dismissed, suspended, or required to undergo drug counsel-

1. Baer, *Labor Relations: Substance Abuse,* N.Y. L.J., June 5, 1987, at 1, col. 1 (citing *Alcohol and Drugs in the Workplace: Costs, Controls and Controversies,* BNA Special Report 7–9 (1986)).

2. Newsweek, Sept. 14, 1987, at 4 (attributed source: Dr. David Russell, Executive Knowledgeworks).

3. *Id.*

4. *Transit Mishaps Tied to Drugs,* N.Y. Times, Sept. 19, 1986, at B–2, col. 5.

5. *Drug Testing on Rails Praised as a Deterrent,* N.Y. Times, Feb. 19, 1987, at B–2, col. 4.

6. *Id.*

7. Also named as defendants are several officials of the TA, named in both their individual and official capacities. The Manhattan and Bronx Surface Transit Operating Authority is also a defendant in one of the actions. It appears that their position in these proceedings is identical to that of the TA.

8. For a good discussion of the various tests and their strengths and weaknesses, see Rust, *The Legal Dilemma,* A.B.A.J., Nov. 1, 1986, at 51.

ling. A refusal to submit to testing could result in immediate dismissal, or, in the case of job applicants, ineligibility for hire.

As public employees, it might be thought that the plaintiffs have reduced expectations concerning their rights to privacy as compared to the concern for the public safety. Ironically, however, because they *are* public employees, the parties performing the tests are governmental entities and the fourth amendment, made applicable to the states through the fourteenth amendment, protects citizens from unreasonable governmental intrusions. Consequently, it can be argued that procedures that might be allowable by a private employer may not be constitutionally permissible if done by a public employer.[9]

The several actions before us center around many of the same essential considerations, principally the issue of whether drug testing constitutes an unreasonable search or seizure under either the United States or the New York Constitution. Nonetheless, there are certain distinctions which, along with the disposition of the various motions, should be noted at the outset. Generally, the defendants have moved to dismiss virtually all claims pursuant to Fed.R.Civ.P. 12(b). All plaintiffs have moved for partial summary judgment on the primary search-and-seizure claim, as well as for summary judgment on certain of their individual claims.

### The *Burka* Action[10]

The *Burka* plaintiffs seek to represent five proposed subclasses of employees who have been or could be subjected to adverse employment action based on drug-test results. The plaintiffs seek to challenge all instances of drug testing except those when a supervisor has reason to believe the employee is impaired because of drug use or when an employee previously has tested positive for drug use.

The *Burka* plaintiffs raise claims under section 504 of the Federal Rehabilitation Act of 1973, along with claims of violations of due process, equal protection, and unreasonable search and seizure under both the Federal and State constitutions. In addition, they claim a violation of their Federal constitutional right to privacy, and assert pendent state claims under N.Y.Exec.Law § 296(1)(a) & (d) (McKinney 1982) and N.Y. Civ.Serv.Law § 50(4) (McKinney 1983). These plaintiffs move for summary judgment on two of their claims: (1) unreasonable search and seizure; and (2) a portion of their due process claim. The plaintiffs allege a violation of their right to be free from unreasonable search and seizure in that the TA's urinalysis testing is not based on probable cause or even reasonable suspicion of drug abuse, does not establish

---

9. We hasten to emphasize the word "may," and we note the growing body of case law that recognizes the very different characteristics of government as law enforcer or regulator vis a vis its role as employer—a distinction long-recognized by the Supreme Court. *Pickering v. Board of Edu.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). As this court noted over a decade ago:

> There is no doubt that the government should be able to manage its agencies and offices effectively and without undue restrictions on the supervision of its employees. What would be normal in the supervision and control of employees in a private business should be allowable in government offices as well.

*United States v. Kahan,* 350 F.Supp. 784, 791 (S.D.N.Y.1972), *aff'd in part and rev'd in part,* 479 F.2d 290 (2d Cir.1973), *rev'd,* 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974). More recently, in a drug-testing case discussing this issue, and noting *Kahan,* a Georgia colleague concluded that although government employees enjoy the same rights as other citizens to be free from warrantless searches, "the government has the same right as any private employer to oversee its employees and investigate potential misconduct relevant to the employee's performance of his duties." *Allen v. City of Marietta,* 601 F.Supp. 482, 491 (N.D.Ga.1985). We believe an appreciation of these distinctions between government as law enforcer and as employer is central to a proper understanding of the issues before us.

10. The *Burka* action is described at length in this court's decision of *Burka v. New York City Transit Auth.,* 110 F.R.D. 595 (S.D.N.Y.1986). In that decision, we denied without prejudice to its later renewal a motion for class certification. *Id.* at 608. The complaint alleges nine separate claims for relief (six Federal, three State) on behalf of all five named plaintiffs. Some of the named plaintiffs acknowledge marijuana use, but most deny it. Significant problems exist with respect to typicality and numerosity. *See id.* at 601–08 (discussing these issues).

whether an employee is impaired by the alleged marijuana use, and bears no rational relationship to the TA's interest in public safety.

The defendants move to dismiss the entire *Burka* action on various grounds. They argue that the plaintiffs' claim under the Rehabilitation Act should be dismissed because the plaintiffs are not "handicapped" persons and, thus, are not protected within the meaning of that Act. Defendants also contend that the plaintiffs fail to make out a Federal or State claim for unreasonable search or seizure because drug testing is rationally related to the TA's legitimate interest in safety. They argue further that drug use does not fall within the parameters of the right to privacy, whatever those parameters may be. Defendants maintain that the due process claim must fail since drug testing is scientifically sound and positive results provide a valid basis for termination, and that whatever hearings may be required are provided to those so entitled. The equal protection claim fails, defendants contend, since drug testing survives scrutiny under the rational relationship test, which they argue must apply in this case. Finally, defendants urge that the pendent state claims be dismissed.[11]

### The Transport Workers Action

In a related action, the Transport Workers Union (the "TWU") challenges defendants' drug-testing policies on behalf of its members. The TWU seeks declaratory and injunctive relief ordering that the defendants: (1) only be permitted to subject TA employees to drug testing based on reasonable suspicion of drug use that is causing impairment; (2) be required to establish guidelines for determining reasonable suspicion; and (3) be required to establish safeguards against supervisory abuse in ordering employees to submit to drug tests. These claims are asserted under the fourth and fifth amendments to the United States Constitution. The TWU also contends that, because the TA treats an employee's refusal to submit to urinalysis testing as an admission of drug use, the TA policy violates the fifth amendment. The defendants move to dismiss the TWU action in its entirety, while the TWU moves for summary judgment.

### The Fa Action

Plaintiff Fa was employed by the TA for 17 years and was a bus driver. The day before taking five weeks of paid vacation, he was unable to work because of illness. When he returned five weeks later, he was given a complete physical including urinalysis which tested positive for marijuana. Denying such use, he refused counselling services and was then suspended and ultimately dismissed.

Fa raises claims virtually identical to those asserted in the *Burka* suit. Fa adds, however, that he was denied due process because the TA failed to give preclusive effect to a decision issued by an administrative law judge who, in ruling that Fa was eligible for employment benefits, based the decision in part on Fa's "credible and consistent testimony" denying marijuana use. Fa moves for summary judgment on his search and seizure claims and his due process/collateral estoppel claim.[12]

### Intervenor Salazar's Claims

An intervenor in the *Burka* action, plaintiff Salazar was also a bus driver. He had been employed for six years and had been issued 33 "cautions." As part of a "periodic" physical examination, a urinalysis

---

11. In certain post-motion submissions, the defendants also seem to be arguing that plaintiffs are precluded from litigating their claims because of the results of earlier arbitrations, administrative hearings, or plea bargains. Because of the number of plaintiffs involved, and the fact that other class representatives could undoubtedly be found, we will reserve consideration of this claim for the renewal of the class certification motion.

12. A recent letter from counsel for Fa indicates that he seeks summary judgment on two other aspects of his due process claim: (1) that his termination was based solely on unreliable drug screening tests, and (2) that his termination was based solely on tests that did not measure intoxication or impairment. His motion papers do not support this reading.

showed positive findings of marijuana (on two separate tests). He was suspended for thirty days and given a warning.

He asserts claims under Federal and State law for violation of his right to be free from unreasonable search and seizure. He also raises a due process challenge to the "substantial evidence" standard used by the TA to sustain disciplinary action taken against him because of drug-test results.[13] In addition, Salazar claims that the TA's testing constitutes an invasion of privacy, and, further, that the inherent unreliability of the tests violates fundamental notions of due process. In particular, Salazar points out that the tests do not show how long ago the drug was ingested or whether it presently impairs job performance. Salazar moves for summary judgment on his Federal and State search and seizure claims, and on his additional claim challenging the standard used by the TA to review drug-violation claims.

## II.  DISCUSSION

### a.  The Rehabilitation Act and Related Claims

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982) ("section 504"), prevents an employer receiving Federal financial assistance from discriminating against an "otherwise qualified handicapped individual."[14] Section 7 of the Act ("section 7") defines a "handicapped individual," for employment purposes, as any person who has or is perceived as having "a physical or mental impairment which substantially limits one or more of such persons major life activities." 29 U.S.C.

§ 706(7)(B) (1982). In 1978, Congress amended section 7 to provide expressly that, for purposes of employment discrimination,

> the term "handicapped individual" ... does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

Pub.L. No. 95–602, § 122(a), 92 Stat. 2955, 2984–85 (1978) ("1978 amendment").

Grafting the ambiguous language from the 1978 amendment, the *Burka* and *Fa* complaints allege that plaintiffs are or are perceived by the TA as being "drug abusers" by virtue of their positive drug-test results. As such, plaintiffs contend, they are "handicapped individuals" within the meaning of the statute and, under the terms of the 1978 amendment, cannot be discharged or rejected for hire unless it can be shown that they cannot perform their job-related duties or that they constitute a direct threat to public safety. It is alleged that since the TA based the hiring or firing of plaintiffs solely on the basis of drug-test results, and made no inquiry into job-related performance or capability, the TA's actions are in violation section 504.

There is little case law addressing the specific question of whether drug abuse (or, more specifically in these cases, marijuana abuse) generally constitutes a handicap for purposes of protection under section 504.[15] The issue appears to be one of

---

**13.** The TA found that, in suspending Salazar, the claim of drug use was supported by "substantial evidence." Salazar claims that under N.Y.Civ. Serv. § 75 (McKinney 1983), a "preponderance of the evidence" standard should have been applied and that the TA's failure to do so violated New York law and Federal due process.

**14.** In 1986, the Act was amended and the term "handicapped individual" was replaced, wherever it appeared in the statute, by the term "individual with handicaps." Pub.L. No. 99–506, § 103(d)(2)(B), 100 Stat. 1807, 1810 (1986). Even if that language controls with respect to the actions in issue (these cases were initiated in

1985), the change is inconsequential to the cases at bar.

**15.** There appear to be two cases on point. In *McCleod v. City of Detroit,* 39 Fair Empl.Prac. Cas. (BNA) 225 (E.D.Mich.1985), which involved a Rehabilitation Act challenge to the City of Detroit's policy of drug screening applicants for fire fighting positions, Judge Cohn held that marijuana use does not constitute a handicap under the Act and that, even if it did, the plaintiffs were not "otherwise qualified" for the positions they sought by virtue of their marijuana use. *Id.* at 228. Although we today reach a result similar to that reached by Judge Cohn in *McCleod,* we do so for different reasons. The

first impression for this circuit.[16] As Judge Richey accurately prophesied, however, Rehabilitation Act challenges are a predictable and inevitable consequence of employer drug testing. C. Richey, *Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts* at F–3 to F–4 (Federal Judicial Center rev. ed. 1986). For the reasons that follow, we find that plaintiffs have not stated a cause of action under section 504 of the Rehabilitation Act, and we dismiss those claims.

■ Plaintiffs' claims are premised on a curious interpretation of the 1978 amendment. In essence, Fa and the *Burka* plaintiffs contend that, due to their use or perceived use of illegal narcotics, they are protected from adverse employment action as long as they (plaintiffs) can continue to do the job in spite of their alleged "handicap." On its face, this interpretation defies logic. Congress in recent years has devoted millions of Federal tax dollars to the war against drugs and, consistent with that effort, Exec. Order No. 12,564, 3 C.F.R. 224 (1987), *reprinted in* 5 U.S.C. § 7301 note, at 175–77 (Supp. IV 1986) demands that Federal agencies begin implementing steps to eradicate drugs in the workplace. It would seem untenable to suggest that the Congress, and the Executive branch by administrative regulation, constructed and maintains the Rehabilitation Act partly as a bulwark to protect illegal drug users from "discrimination" in employment. The notion that Congress would consider illegal drug abusers, as a general group, to be "handicapped individuals" within the meaning of section 504 is antithetical to the goals of sound law enforcement and trivializes the commonly understood meaning of the word "handicapped."

■ We believe, therefore, that in enacting the 1978 amendment to section 7, Congress intended a meaning far narrower than that espoused by plaintiffs. We hold today that section 504 protects only those otherwise qualified drug abusers who have been or are being rehabilitated. It does not protect the illegal narcotics abuser who has not sought or is not seeking treatment for his or her condition. Contrary to plaintiffs' reading, this critical distinction finds ample support in the legislative history.

After adoption of the 1973 Act, a consensus developed amongst Federal regulators whereby "alcoholics" and "drug addicts" were interpreted as being included within the meaning intended by Congress of the term "handicapped individual." The Department of Transportation regulations, which control in the cases at bar, expressly provide that "alcoholism" and "drug addiction" are to be considered "physical or mental impairments" under the Act and, as such, constitute handicaps for purposes of protection under section 504. 49 C.F.R.

only other case on point appears to be *Davis v. Bucher,* 451 F.Supp. 791 (E.D.Pa.1978), which involved a challenge to the City of Philadelphia's general hiring policy of rejecting any applicant with a history of prior drug use. Our conclusions today are consistent with Judge Cahn's findings in *Bucher* that section 504 protection extends only to rehabilitated and rehabilitating drug abusers. *Id.* at 796. *Bucher,* however, was decided prior to the 1978 amendment. Plaintiffs contend that the 1978 amendment effectively broadened the scope of coverage under section 504. Accordingly, we cannot simply rest on *Bucher* and must provide the more expansive analysis contained in this opinion.

**16.** Plaintiffs argue that this specific issue was decided in the affirmative in *Rodriguez v. New York City Police Dep't,* No. 80 Civ. 4784 (S.D.N.Y. Jan. 19, 1981) (Lowe, J.). Plaintiffs in that case sought positions with the New York City Police Department, and had been disqualified on the basis of urine testing which revealed traces of "an 'unauthorized substance', alleged to be valium or another benzodiazepine." *Id.,* slip op. at 2. Judge Lowe held that plaintiffs, by virtue of their alleged drug use, had made a prima facie showing that they were "protected as 'handicapped individuals' within the meaning of the Act." *Id.,* slip op. at 23. That decision, of course, is not binding precedent on this court. Moreover, the decision was rendered in the context of a request for judicial approval of a proposed class-action settlement, and Judge Lowe's findings were made as a means of "assess[ing] the fairness, adequacy and reasonableness of the proposed settlement by considering the strength of plaintiffs' case on the merits, balanced against the offered settlement." *Id.,* slip op. at 20. Properly viewed in that context, we doubt the decision has any precedential value in this circuit on the specific issue of whether general drug abuse constitutes a handicap for purposes of section 504.

§ 27.5, at 190 (1986). Extensive explanations of this issue provided by the then-Secretary of Health, Education and Welfare and the Attorney General support this reading. 42 Fed.Reg. 22,686 (May 4, 1977); 43 Op. Att'y Gen. 12 (1977). In apparently the only case to address specifically this issue, it was held, consistent with those administrative interpretations, that section 504 does extend protection to drug addicts, but *only* to those who were rehabilitated or were in the process of rehabilitating, and not to drug users generally. *Davis v. Bucher*, 451 F.Supp. 791, 796 (E.D.Pa. 1978).

The 1978 amendment on which plaintiffs rely apparently was enacted in response to employer concerns with these interpretations, especially as they related to application under section 503 of the Act, 29 U.S.C. § 793 (1982) ("section 503"), which requires Federal contractors to take affirmative action in hiring "handicapped individuals." Employers, concerned that affirmative action and other Rehabilitation Act requirements would force them to hire alcoholics and drug addicts without regard to their qualifications, sought a clarification of the law. *See* 124 Cong.Rec. 30,323 (1978) (statement of Sen. Williams) (Congress has "been under pressure to adopt language that would exclude alcoholics and drug dependent persons from all protection under sections 503 and 504...."); *id.* at 30,324 (statement of Sen. Hathaway) ("The purpose of the pending amendment is to meet the concerns of employers ... [regarding employment of alcoholics and drug addicts].").

The 1978 change originated as a committee amendment offered by Congressman Erlenborn to H.R. 12467, an omnibus bill addressing handicap and other concerns. It amended section 7 of the Rehabilitation Act to provide that, "[f]or purposes of sections 503 and 504, [the term 'handicapped individual'] does *not* include any person who is an alcoholic or who is a drug abuser in need of rehabilitation." H.R.Rep. No. 1149, 95th Cong., 2d Sess. 49 (1978), U.S. Code Cong. & Admin.News 1978, 7312. There was no discussion of the Erlenborn Amendment on the House floor during consideration of H.R. 12467, but the committee report makes clear the intention behind the amendment:

> The committee emphasizes that an individual with a record of alcohol or drug abuse or who is regarded as being an individual who is an alcoholic or drug abuser may still be protected by the provisions of sections 503 and 504 *if he or she is not in need of rehabilitation.* This protects otherwise qualified *self-reformed* or *rehabilitated* alcoholics or drug abusers from unreasonable discrimination.

*Id.* at 23, U.S.Code Cong. & Admin.News 1978, at 7334 (emphasis added). There can be no doubt, therefore, that the original thrust of the 1978 change was to clarify that coverage under sections 503 and 504 was even more limited than articulated in *Bucher*, and would be extended only to *rehabilitated* drug abusers. There is no reading that provides initial support for plaintiffs' interpretation that the 1978 change was designed to *expand* protection beyond *Bucher* to include drug abusers generally.

During Senate consideration of the companion bill to H.R. 12467, Senators Cannon and Williams offered a modified version of the Erlenborn Amendment which was approved on voice vote by the Senate. The Cannon–Williams Amendment excluded from the definition of "handicapped individual," for employment purposes, "an alcoholic ... or drug abuser ... whose condition ... renders that individual not qualified for employment by preventing him from performing the essential functions of the job in question." 124 Cong.Rec. 30,322 (1978). During floor debate on the amendment, Senator Williams noted that the amendment's purpose was to make "clear that the intent of Congress is not to force employers to hire alcoholics or drug-dependent persons to perform jobs for which their condition makes them unsuited." *Id.* at 30,324. In that sense, the Senate amendment, consistent with the concerns apparently expressed by employers, clarified that certain alcoholics or drug abusers, even if "handicapped individual[s]" under

the Act, are not "otherwise qualified" for employment if the alcoholism or drug addiction renders a person unfit for employment.

Plaintiffs, however, focus on the Senate's decision to eliminate the "in-need-of-rehabilitation" language contained in the Erlenborn Amendment. Since the Senate bill and ultimately the statute referenced only "drug abusers" generally, and was not limited to "drug abusers in need of rehabilitation," all drug abusers, plaintiffs argue, qualify for protection under section 504. Again, the legislative history belies plaintiffs' interpretation. The Senate's concern with the Erlenborn language was that it was overly broad and might have the effect of excluding from protection *all* alcoholics and drug abusers. 124 Cong.Rec. 30,323 (statement of Sen. Williams). The Cannon–Williams Amendment, by deleting the "in-need-of-rehabilitation" language, sought merely to ensure that protection would be provided to both rehabilit*ating* and rehabilit*ated* employees, if otherwise qualified. As Senator Williams made clear:

> [T]he House language would require that anyone who wants protection against discrimination must quit any counseling or aftercare program for fear of being labeled "in need of rehabilitation," which would deny him protection.
>
> Many authorities, including the Federal courts, have recognized that persons stabilized in methadone maintenance treatment are fully employable. If the House-passed amendments became law, such persons might be denied employment rights because they are taking a drug for their condition and [sic] therefore "in need of rehabilitation."

*Id.*[17] Thus, the thrust of the Erlenborn Amendment—to ensure employers and others that sections 503 and 504 extended only limited coverage to certain alcohol and drug abusers—remained intact. The Senate amendment merely made clear that coverage, although limited, would be provided to both rehabilitated *and* rehabilitating employees.

The final language emanating from the conference committee and enacted into law, which sanitized the Senate amendment and added a further provision allowing employers to discharge alcoholics or drug abusers who constitute "a direct threat to property or the safety of others," does not alter this reading of congressional intent. In the only House or Senate statement discussing the conference committee language, Senator Williams concluded:

> This amendment is designed to clear up some misunderstandings about the employment rights of alcoholics and drug addicts under the act.... First, while the legislative history of the 1973 act, as authoritatively interpreted by [administrative agencies], made clear that qualified individuals with conditions or histories of alcoholism or drug addiction were protected from discrimination by covered employers, this amendment codifies that intent. This explicit protection is long overdue and well warranted. The experience of treatment professionals and major employers alike has demonstrated that many *recovered* alcoholics and drug abusers perform competently and reliably.... At the same time, the language makes clear that an employer cannot assume that a history of alcoholism or drug addiction, *including a past addiction currently treated by methadone maintenance,* poses a sufficient danger in and of itself to justify exclusion.

124 Cong.Rec. 37,509–510 (emphasis added).

In the final analysis, then, the legislative history makes unmistakably clear that Congress did not intend to broaden coverage under sections 503 and 504 beyond rehabilitated and rehabilitating drug abusers, established limits already recognized by "[m]any authorities, including the Federal courts." 124 Cong.Rec. 30,323 (statement

---

17. Senator Williams' reference to "the Federal courts" is presumably a reference to *Bucher,* the only case to have addressed the drug issue at that time. Perhaps not coincidentally, *Bucher,* like Senator Williams' statement, included a specific reference to "participants in a methadone maintenance program" as an example of a protected, rehabilitating drug addict who might be "otherwise qualified" for employment. *Bucher,* 451 F.Supp. at 796.

of Sen. Williams). Rather, the 1978 amendment was designed to ensure employers that rehabilitated and rehabilitating drug abusers, even if protected, could nonetheless be discharged or considered ineligible for hire if the individual's condition prevented him or her from performing the job in question or constituted a threat to property or public safety.

Plaintiffs make much of the fact that the conference report suggests that *"active* alcoholics or drug abusers" are protected under sections 503 and 504. H.R.Conf.Rep. No. 1780, 95th Cong., 2d Sess. 102 (1978) (emphasis added). Similar references were made during debate on the Cannon–Williams Amendment. 124 Cong.Rec. 30,-324 (1978) (statement of Sen. Williams); *id.* (statement of Sen. Hathaway). Plaintiffs contend that since "active" drug abusers are protected, any current user of marijuana must be considered a "handicapped individual" for purposes of section 504. We disagree. We believe that any reference to the word "active" merely reflects the Senate's interest in ensuring protection not only for rehabilitated abusers, but for those drug abusers who currently are seeking treatment as well. As our opinion makes clear, we view this as the crucial distinction between the approach originally adopted by the House under the Erlenborn Amendment and the resulting Senate language (as modified by conference). Use of the word "active" at various points in the legislative history, therefore, merely confirms rather than contradicts our reading of congressional intent. *See especially id.* (statement of Sen. Williams) (noting many alcoholics or drug addicts "remain *active* in ... Alcoholics Anonymous or Narcotics Anonymous") (emphasis added).

We think it evident from this study of the legislative history that, although the language of the 1978 amendment "is not free from ambiguity," *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 581, 99 S.Ct. 1355, 1363, 59 L.Ed.2d 587 (1979), Congress's meaning is clear—sections 503 and 504 extend protection only to rehabilitated or rehabilitating drug abusers.[18] This is consistent with sound public policy. It encourages those abusers of illegal narcotics who have not done so to seek treatment for their problem, but it does not provide those same abusers with the assurance of safe haven in the workplace should they instead choose to continue their illegal activity and ignore help.

■ Applying this holding to the facts of the cases at bar, we find that Fa and the *Burka* plaintiffs have not stated claims under section 504. The TA policy expressly provides that employees or applicants shall advise the TA if the individual is taking a medically authorized drug. Despite ample opportunity to do so, both prior to and after testing, plaintiffs have not advised the TA that any drug testing showing marijuana use could somehow be ex-

---

**18.** We note that some may perceive a further tension in the statute's use of the term "drug *abuser,"* instead of "drug *addict."* Generally, voluntary impairments are not protected under sections 503 and 504. *Tudyman v. United Airlines,* 608 F.Supp. 739, 746 (C.D.Cal.1984). Accordingly, voluntary drug use should not become a handicap until it reaches the stage of an involuntary impairment, presumably at addiction. The statute, for example, does not protect all people who consume alcohol; it protects only alcoholics. One would assume that this reflects the general view that alcoholism, as a disease, erodes or vitiates one's control over alcohol consumption and, thus, constitutes a handicap.

The legislative history is replete with references to "drug addicts," and suggests that Congress viewed the terms "drug addict" and "drug abuser" as interchangeable. The regulations, likewise, reference "drug addicts," even though the statute references "drug abusers." To the extent that there is a distinction between the terms, our holding today renders it a distinction without a difference. For practical purposes, an individual who seeks treatment for a substance abuse problem is tacitly, if not expressly, admitting a loss of control over that problem. As such, the problem rises to the level of handicap deserving of protection under sections 503 and 504. Further, the holding advances the policy goal of encouraging treatment, and eliminates the potential straw man of requiring employees to produce some sort of document "certifying" an actual "addiction." In sum, the crucial question of an employee, or prospective employee, remains: can that person demonstrate that he or she is rehabilitated or currently is receiving treatment for substance abuse? Only if the answer is in the affirmative will that person be considered a "handicapped individual" for purposes of protection under sections 503 and 504.

plained by the plaintiffs' participation in a rehabilitation program. We doubt this could be done; but, more importantly, it has not been done. In fact, the complaints urge that certain of the plaintiffs do not use marijuana (and the tests, therefore, are in error) or that whatever use there may have been did not or would not affect job performance. No one has alleged that current drug use is somehow the result of participation in a treatment program. Accordingly, the TA was certainly within its rights to assume that plaintiffs were not enrolled in any sort of rehabilitation program, and could dismiss or refuse to hire plaintiffs on the basis of drug-test results without violating the Rehabilitation Act.[19] Because plaintiffs, simply by virtue of their use or perceived use of marijuana, do not qualify as "handicapped individuals" for purposes of protection under section 504, we dismiss the Rehabilitation Act claims.[20]

■ These plaintiffs assert similar, pendent state claims under the corollary provision of New York's Human Rights Law which prohibits employment discrimination based on "disability." N.Y.Exec.Law § 296(1)(a) & (d) (McKinney 1982) ("section 296"). The scope of section 296 was discussed fully by General Counsel for the State Division of Human Rights in an interoffice memorandum dated November 21, 1979 (attached as an exhibit accompanying plaintiffs' brief on the *Burka* motions). Based on a reading of that memo, as well as the other material and cases cited in plaintiffs' brief on this question, it is clear that our Rehabilitation Act analysis is equally applicable to section 296. We find that section 296 does extend protection to rehabilitated and rehabilitating drug abus-

ers, but that is of little avail to plaintiffs for the reasons set forth above. Accordingly, plaintiffs claims based on New York's Human Rights Law also are dismissed.

The *Burka* plaintiffs also assert claims under N.Y.Civ.Serv.Law § 50(4)(b) (McKinney 1983) ("section 50"), which provides that applicants for civil service positions may be disqualified if that person "is found to have a mental or physical disability which renders him unfit" for employment. Like the Rehabilitation Act claim, plaintiffs contend that there has been no showing by the TA that their alleged "disability" renders plaintiffs unfit for employment. Again, we have read the material in plaintiffs' brief on this question, and there is nothing to persuade us that coverage under section 50 is broader than or inconsistent with section 296, discussed above. Rather, we find that section 50 is part of a consistent statutory scheme designed to provide New York's handicapped and disabled persons with protection against warrantless discrimination. For reasons we have made clear, plaintiffs, for employment purposes, are not part of this protected class of handicapped or disabled employees, and defendants' motion to dismiss the section 50 claim is granted.

### b. Equal Protection Claims

The Equal Protection Clause prohibits any State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The *Burka* plaintiffs, Fa, and Salazer allege a violation of their equal protection rights, pursuant to 42 U.S.C. § 1983 (1982),

---

**19.** We hasten to emphasize, of course, that even if any of the plaintiffs had so advised the TA, the TA could still dismiss or refuse to hire plaintiffs and not run afoul of section 504 if any of the plaintiffs were not "otherwise qualified" under the Act. This could include a determination as to whether the addiction "prevents the individual from performing the duties of the job in question or ... would constitute a direct threat to property or the safety of others." 29 U.S.C. § 706(7)(B) (1982). Among other things, this prevents an employee from using the guise of treatment as an impenetrable shield against adverse employment action.

**20.** The *Burka* plaintiffs also assert claims under 49 C.F.R. § 27.37(a) (1986), the Department of Transportation regulations prohibiting an employer subject to section 504 from "conduct[ing] a preemployment medical examination or inquiry ... as to the nature or severity of a handicap." Holding as we do that illegal narcotics use does not, *per se*, constitute a handicap under the Rehabilitation Act, it necessarily follows that the TA's drug-testing policy does not constitute a preemployment screening for handicap. Accordingly, that claim also is dismissed.

claiming that they "are not afforded the same protection as other *disabled* employees, such as alcohol users...." *Burka* Complaint ¶ 6 (emphasis added). We find plaintiffs' equal protection claims to be without merit on any number of bases.

■ First, in a case involving an equal protection challenge to a prior TA rule prohibiting TA employees from using or possessing narcotics, the Supreme Court noted: "In this case, TA's Rule 11(b) places a meaningful restriction on all of its employees and job applicants; in that sense the rule is one of general applicability and satisfies the equal protection principle without further inquiry." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 588, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979). The current policies in issue—prohibiting drug use, requiring drug testing, and disciplining or refusing to hire those who test positive—apply to all TA employees or applicants, not just to plaintiffs or some other discrete class. Consistent with *Beazer,* we see no equal protection violation and plaintiffs' challenges in that regard must be dismissed.

■ Second, even if equal protection concerns are somehow implicated in these cases, the plaintiffs have not stated valid equal protection claims. Plaintiffs attempt to craft claims by seeking refuge amidst an undefined, broad class of "disabled" or impaired employees. They contend that they are treated differently than others (alcohol users) similarly situated within the class, and that such disparate treatment bears no rational relationship to the TA's stated objectives. We find that analysis fatally flawed.

In our view, perceived or actual users of illegal narcotics are not similarly situated with those who legally consume alcohol (and, indeed, plaintiffs have cited no cases that would support their conclusion to the contrary). Plaintiffs have tested positive for use of an *illegal* narcotic. This fact alone readily distinguishes them from those who consume, and perhaps even abuse, alcohol. Alcohol use is not, *per se,* illegal; marijuana use, with rare exception, is. Further, as we made clear in our earlier analysis on the Rehabilitation Act claims, this fact also distinguishes plaintiffs from those handicapped employees that might truly be considered as comprising a class of "disabled" employees. The fact that plaintiffs have tested positive for an illegal narcotic provides a more than sufficient "ground of difference that rationally explains the different treatment accorded" plaintiffs and alcohol users. *Eisenstadt v. Baird,* 405 U.S. 438, 447, 92 S.Ct. 1029, 1035, 31 L.Ed.2d 349 (1972).

■ To the extent then that the instant facts somehow provide plaintiffs with shelter under the Equal Protection Clause, we think it would be more accurate to view illegal narcotics users, and perceived users, as constituting their own class. So viewed, and accepting as we must on a Rule 12(b)(6) motion plaintiffs' claims of disparate treatment, we see no violation. The Equal Protection Clause "does not deny to States the power to treat different classes of persons in different ways." *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971). Thus, disparate treatment of alcohol and drug users is justified under *Reed.* The only question before the court is whether the TA's treatment of plaintiffs and their "class" bears a rational relationship to the policy goals drug testing seeks to advance. There can be no question that it does.[21]

21. It is clear that if an inquiry under the Equal Protection Clause is appropriate in this case, it must be governed by the rational relationship test. The alleged class (or narrower class perceived by the court) has "none of the traditional indicia of suspectness ...," *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1972), and deprivation of public employment is not akin to abridgement of a fundamental right, *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976)—the two circumstances under which heightened or strict scrutiny would be warranted. In addition, to the extent that there exists, de facto or otherwise, a middle tier of analysis, plaintiffs do not contend that this case is appropriate for such review. *See, e.g., Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976) (holding "classifications by gender must serve important governmental objectives and

The TA asserts that its policy is designed to help ensure a safe and dependable public transit system. Part and parcel of that goal, it seems to us, is maintaining public confidence in both the system and its employees. Drug testing, by screening out illegal narcotics users, certainly is rationally related to those ends. Marijuana use may not be considered by some to be as serious as other types of criminal activity. Marijuana use or possession, nonetheless, generally is illegal, and the TA's efforts to screen out illegal narcotics users is rationally calculated to improve the safety of the system and enhance public confidence.

Plaintiffs argue that current drug-testing technology is imperfect and that a screening program based on a more individualized investigation designed to measure a particular employee's or applicant's qualifications would better serve the TA's goals. These facts, even if true, do not provide this court with sufficient grounds for striking down the policy. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 316–17, 96 S.Ct. 2562, 2568–69, 49 L.Ed.2d 520 (1976); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). The means chosen by the TA are rationally related to the goals asserted, which is all that the equal protection clause would require in this case.

For all of these reasons, plaintiffs' claims under the Equal Protection Clause are dismissed.

Plaintiffs assert a pendent equal protection claim under N.Y. Const. art. 1, § 11. It is well settled that protection under the equal protection clauses of the United States and New York constitutions are coextensive. *Dorsey v. Stuyvesant Town Corp.,* 299 N.Y. 512, 530, 87 N.E.2d 541 (1949), *cert. denied,* 339 U.S. 981, 70 S.Ct. 1019, 94 L.Ed. 1385 (1950). Accordingly, that claim also is dismissed.

#### c. The Privacy and Unreasonable Search and Seizure Claims

We turn now to the central question raised by all plaintiffs: whether requiring

TA employees or prospective employees [22] to submit to urinalysis testing for narcotics use is an unreasonable search or seizure under the fourth amendment of the United States Constitution or article I, section 12, of the New York State Constitution. Search-and-seizure analysis begins with a determination as to whether there was an actual search or seizure by the government. If so, the court then must balance the government's interests with that of the private party to determine if the search or seizure was reasonable.

We note initially, without determining the issue, that this court has certain reservations as to whether mere production of a urine specimen, if done in conjunction with a routine medical exam or pre-employment physical, constitutes a search or seizure, since a urine sample typically is required in order to check for numerous medical problems such as diabetes. We recognize that there is considerable precedent to the contrary, but that precedent is outside this circuit.

Nor, in measuring the reasonableness of the purported search and/or seizure, do we view the test as intrusive in the sense of an intrusion into the body, as is necessary for a blood test, because urine is a waste product that a person discharges periodically in any event. Again, we recognize that there is certain precedent outside this circuit to the contrary; but, as will be noted *infra,* there is a divergence of views on this point.

Plaintiffs contend that the TA testing procedures: (1) make production of the urine sample compulsory, and therefore involuntary; (2) require the urine sample to test specifically for the presence of marijuana, and not for other medical problems; and (3) require the samples to be produced in the presence of an observer, thus greatly intruding upon an individual's privacy.

#### Federal Cases

Neither the Supreme Court nor the Second Circuit has considered a case directly

---

must be substantially related to achievement of those objectives").

**22.** We intimate no view at this time whether inclusion of prospective employees within the *Burka* putative class action is appropriate.

on point.[23] Both sides rely on Second Circuit cases that concededly have some precedential effect, but they are not dispositive.

The plaintiffs argue that *Security and Law Enforcement Employees, Dist. Council 82 v. Carey*, 737 F.2d 187 (2d Cir.1984) supports their position. In that case, the majority held that a reasonable suspicion standard governs strip searches of correction officers, *id.* at 204, noting expressly that warrantless strip searches did not *per se* violate the fourth and fourteenth amendment rights of the officers. *Id.* at 203. The court did conclude, however, that warrantless visual body cavity searches and a random search policy did violate those rights. *Id.* at 208–09. The case obviously makes a distinction between the degree of personal intrusion, as well as the basis for making the search. A vigorous dissent argued that, because of the dangerous nature of prison work, the only limitation on strip searches should be that they not be conducted arbitrarily. *Id.* at 211–13 (Van Graafeiland, J., dissenting).

Defendants rely upon *Mack v. United States*, 814 F.2d 120 (2d Cir.1987). The plaintiff was dismissed as an FBI agent due to alleged cocaine use and lack of candor regarding that use. *Id.* at 122. He voluntarily submitted to a urinalysis, but in his court action challenged its use. The trial court found that, assuming a urinalysis amounts to a search of constitutional dimensions, it was not unreasonable in light of all the circumstances (minimally intrusive, diminished expectation of privacy as an FBI agent, and compelling governmental interests). *Id.* The appeals court held that, in light of plaintiff's consent to urinalysis testing, there was no need to consider the more complex aspects of the fourth amendment issue, and affirmed on those grounds. *Id.* at 125. Consequently, only the district court opinion, which is not controlling on this court, supports the defendants' position.

Numerous other courts have considered the fourth amendment implications of drug testing.[24] In addition, it has been the sub-

---

**23.** The Supreme Court did reverse the Second Circuit in a challenge to the TA's predecessor drug-testing policy, but the constitutional challenge there was on equal protection grounds. *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), *rev'g* 558 F.2d 97 (2d Cir.1977).

**24.** Plaintiffs' counsel in the *Burka* action, The Legal Action Center, prepared a table of such cases decided through 1986 which was printed in Banzhaf, *How to Make Drug Tests Pass Muster*, Nat'l L.J., Jan. 12, 1987, at 24. We have updated certain of the citations, but draw no conclusions at this time as to the accuracy of the interpretations set forth by plaintiffs.

**Urinalysis Testing Not Allowed as Unconstitutional:**

*Anabel v. Ford*, 633 F.Supp. 149 (W.D.Ark. 1985) (testing school children by school board).

*Odenheim v. Carlstadt–East Rutherford Regional School Dist.*, 21 N.J.Super. 54, 510 A.2d 709 (Ch.Div.1985) (yearly physicals for students, including urinalysis).

**Urinalysis Testing Requires Probable Cause:**

*Jones v. McKenzie*, 628 F.Supp. 1500, 1508–09 (D.D.C.1986) (testing of school bus attendant).

*National Treasury Employees Union v. Von Raab*, 649 F.Supp. 380, 387 (E.D.La.1986), *rev'd*, 816 F.2d 170 (5th Cir.1987), *expedited cert. denied.,* —— U.S. ——, 107 S.Ct. 3182, 96

L.Ed.2d 671 (1987) (testing of Customs Service employees).

**Urinalysis Testing Requires Reasonable Suspicion:**

*Allen v. City of Marietta*, 601 F.Supp. 482, 484 (N.D.Ga.1985) (city employees suspected of using drugs and engaged in hazardous work).

*Allen v. County of Passaic*, 219 N.J.Super. 352, 530 A.2d 371 (N.J.Super.Ct.Law Div.1986) (on appeal) (random testing of all persons in county sheriff's department).

*Bostic v. McClendon*, 650 F.Supp. 245, 250 (N.D.Ga.1986) (testing of police officers).

*Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986) (surprise testing of fire fighters).

*Caruso v. Ward*, 133 Misc.2d 544, 506 N.Y.S. 2d 789, 798–99 (Sup.Ct.1986) (police officers in New York Police Department's Organized Crime Control Bureau).

*City of Palm Bay v. Bauman*, 475 So.2d 1322 (Fla.Dist.Ct.App.1985) (police officers and fire fighters).

*Division 241, Amalgamated Transit Union v. Suscy*, 538 F.2d 1264 (7th Cir.), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (bus drivers).

*King v. McMickens*, 120 A.D.2d 351, 501 N.Y.S.2d 679 (1986) (corrections officer).

*Lovvorn v. City of Chattanooga*, 647 F.Supp. 875, 880 (E.D.Tenn.1986) (city fire fighters).

*McDonell v. Hunter*, 612 F.Supp. 1122 (S.D. Iowa 1985), *aff'd as modified*, 809 F.2d 1302, 1309 (8th Cir.1987) (correctional facility guards).

ject of various written and oral debates.[25]

Generally, it appears that the great majority of pre–1987 cases considering the issue, particularly those at the district-court level, found random testing to be unconstitutional. This line of authority is perhaps best typified by the sweeping language embodied in *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986), which found urinalysis to be highly intrusive, *id.* at 1514, and unconstitutional unless motivated by individualized, reasonable suspicion. *Id.* at 1516. These decisions generally were hailed by the media and academics as praiseworthy expansions of civil liberties. This reaction may be simplistic. What is a liberty to one may be a license to another. Put differently, one person's freedom may be another's burden.[26]

To the limited extent that these earlier cases supported testing as constitutional, exceptions based on occupational hazards, public safety, or government regulation of the industry were cited. *See, e.g., Allen v. City of Marietta*, 601 F.Supp. 482, 491 (N.D.Ga.1985) (involving employees working with high-voltage electrical wires); *Division 241 Amalgamated Transit Union v. Suscy*, 538 F.2d 1264, 1267 (7th Cir.), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (involving bus and train operators); *Shoemaker v. Handel*, 795 F.2d 1136, 1141–42 (3d Cir.), *cert. denied*,

    *McKechnie v. Dargan*, No. 84 Civ. 4339 (E.D.N.Y. Apr. 28, 1986) (transit police).

    *Patchogue–Medford Congress of Teachers v. Board of Edu.*, 119 A.D.2d 35, 505 N.Y.S.2d 888 (1986), *aff'd*, 70 N.Y.2d 57, 69, 517 N.Y. S.2d 456, 462, 510 N.E.2d 325, 330 (1987) (probationary teachers as a condition of receiving tenure).

    *Penny v. Kennedy*, 648 F.Supp. 815, 817 (E.D.Tenn.1986) (police officers).

    *Railway Labor Exec. Assoc. v. Dole*, No. C–85–7958–CAL (N.D.Cal. Nov. 26, 1985) (post-incident testing of railroad employees).

    *Turner v. Fraternal Order of Police*, 500 A.2d 1005 (D.C.1985) (police officers).

**Urinalysis Testing Allowed Without Probable Cause Or Reasonable Suspicion:**

    *Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark*, Doc. No. L–09001–85E (N.J.Super.Ct.Law Div. March 3, 1986), *rev'd*, 216 N.J.Super. 461, 524 A.2d 430 (App.Div. 1987) (members of police Narcotic Bureau).

    *Seelig v. McMickens*, N.Y.L.J., Aug. 7, 1986, at 1, col. 3 (N.Y.Sup.Ct.) (correction officers driving city prison vans).

—— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (involving jockeys in horse racing, a highly regulated industry).

At least two recent appellate decisions upholding testing, however, proceeded from far different conclusions. The Eighth Circuit, in upholding random testing of prison employees having regular daily contact with prisoners, concluded that urinalysis is less intrusive than strip searches or a blood test. *McDonell v. Hunter*, 809 F.2d 1302, 1308 (8th Cir.1987), *rev'g* 612 F.Supp. 1122 (S.D.Iowa 1985). The Fifth Circuit reached a similar conclusion in *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 177 (5th Cir.1987), *rev'g* 649 F.Supp. 380 (E.D.La.1986), a case involving the testing of certain Customs Service employees. (It should be noted that the program there, unlike the one in issue in this case, called for supervised urine collection, but not visual observation.) The Supreme Court, in an 8–1 ruling, refused to stay the 5th Circuit decision, 107 S.Ct. 2479 (1987), and has denied expedited consideration of petitioner's motion for certiorari. 107 S.Ct. 3182.

This court does not view the current state of Federal law on this question to be so settled as to make summary judgment, and certainly not dismissal, appropriate at this stage. Accordingly, the various mo-

    *Shoemaker v. Handel*, 795 F.2d 1136, 1142–43 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (individuals involved in horse racing industry).

**25.** *See, e.g., Mandatory Drug Testing in the Work Place*, ABA J., Aug. 1, 1986, at 34–35 (opposing articles by U.S.Rep. Don Edwards (D–Cal) and Robert Angarola); *A Question of Privacy*, Newsweek, Sept. 29, 1986, at 18.

**26.** We note two examples with which even the most ardent civil libertarian might agree demonstrate this tension. Handgun possession often is defended as a constitutional right under the second amendment. Nevertheless, many States find it necessary to control their use to protect innocent persons. Similarly, some smokers contend that they have a constitutional right to fill their lungs with a carcinogen which, when exhaled, is then inhaled by persons using public accommodations. Non-smokers who are exposed to these fumes believe that their rights to be free from such unpleasantries are being violated.

tions on the fourth amendment claims are denied.

Inextricably bound up with the question of fourth amendment reasonableness are considerations of privacy. Certain plaintiffs also assert privacy claims as separate, independent causes of action. In that vein, a recent Second Circuit case may have some application. *See Chalfy v. Turoff*, 804 F.2d 20, 23 (2d Cir.1986) (per curiam) (discussing privacy implications of limousine licensing requirements). Of course, whether there is a "right to privacy" *per se* under the Constitution is a much-debated question. The word "privacy" appears nowhere in that historic document. The Bill of Rights, however, protects certain aspects of privacy, such as the right to be secure in one's home. During the years when Earl Warren served as Chief Justice, a number of Supreme Court decisions expanded upon the notion that the Constitution contains an implied "right of privacy." This expansive reading of the Constitution seems to be ebbing under the current Supreme Court. *See Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 2843–44, 92 L.Ed.2d 140 (1986) (suggesting privacy rights largely *limited* to family matters).[27] In any event, we do not believe this issue is ripe for disposition at this time.

### State Cases

The plaintiffs rely heavily upon the recent New York Court of Appeals opinion in *Patchogue–Medford Congress of Teachers v. Board of Education*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987), which held that requiring probationary teachers to submit to urinalysis to detect potential drug abuse constituted an illegal search and seizure in violation of the teachers' constitutional rights. There had already been an existing drug detection system in that school district pursuant to a collective bargaining agreement. However, the school district added an additional examination for probationary teachers before granting them tenure. It was clear that the sole purpose of the urine test was to detect drug usage. The New York Court first considered the Federal constitutional standards, noted that the Supreme Court had not passed on the issue, and observed that the lower Federal courts had reached diverse conclusions. *Id.*, 517 N.Y.S.2d at 459, 510 N.E.2d 327. It concluded that a majority of the courts had held that urine testing required by governmental bodies involves a search and seizure, and that reasonable suspicion is required to justify the tests under Federal constitutional standards. *Id.* The Court moved on, however, to note that since the case involved expectations of privacy of State employees, it was appropriate to resolve it under both the Federal and State constitutions. *Id.* It concluded that the testing satisfied neither. *Id.* 517 N.Y.S.2d at 462, 510 N.E.2d 331.[28]

The Court of Appeals focused on the school district's argument that they had the right to compel urine tests at will. It noted that "[a]lthough [urine] is a waste product, it is not generally eliminated in public or in such a way that the public or government officials can gain access to it in order to 'read' its contents." *Id.* 517 N.Y.S.2d at 460, 510 N.E.2d 329. The Court upheld an individual's privacy interest in how he or she disposes of this waste product. Moreover, although unlike the physical intrusion of a blood test, the Court found compelled production of urine intrusive because "[t]he act of discharging urine is a private, indeed intimate, one and the product may contain revealing information concerning an individual's personal life and

---

**27.** The recent nomination of Judge Robert Bork to the Supreme Court brought this issue to the fore. Many of those opposed to his nomination objected to Judge Bork's refusal to accept expansive interpretations supporting a broad-based "right to privacy." Indeed, many Bork opponents made clear that they view a broad "right to privacy" as something of a sacred cow, beyond intellectual reproach, and Judge Bork's disagreement with that view was roundly criticized as being far outside the mainstream of American constitutional thought. We reserve comment on that debate.

**28.** Of course, this Court is compelled to follow the rulings of the highest State court in its interpretation of the State Constitution, but not in its interpretation of the Federal Constitution. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

habits for those capable of analyzing it." *Id.* 517 N.Y.S.2d at 461, 510 N.E.2d 329. Under these circumstances, the State Court concluded that the urine tests constituted a search and seizure.

In analyzing the reasonableness of that search and seizure, the Court found that probable cause and a warrant were not necessary, but that reasonable suspicion was required in order for the school district to compel urine testing for drug abuse. *Id.* 517 N.Y.S.2d at 461–62, 510 N.E.2d 330–31. The school district argued that it was nevertheless permissible to test all employees in a particular category, without reasonable suspicion. The Court rejected this argument, comparing it to the police checking for drunk drivers by stopping all cars at fixed points. The police may only inquire as to sobriety, the Court noted, and can only require a test when indicia of intoxication leading to reasonable suspicion are present. *Id.* 517 N.Y.S.2d at 462, 510 N.E.2d 331. The Court noted that the district had made " 'no attempt to justify the demand for a sample upon any ground supporting the need for such testing either as to the prospective tenured teachers as a class or to any of them individually.' " *Id.* 517 N.Y.S.2d at 458, 510 N.E.2d 327 (quoting trial court decision).

For our purposes, the critical portion of the decision concludes:

> [R]andom searches conducted by the State without reasonable suspicion are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government's interest is substantial, and safeguards are provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion.... In this case those requirements have not been satisfied.

*Id.* 517 N.Y.S.2d at 462, 510 N.E.2d 331 (citation omitted). The decision, therefore, leaves open the possibility that random tests could be permitted if the government's interests are substantial and the employees' reasonable expectation of privacy is not subjected to unregulated discretion.

The plaintiffs claim that urinalysis testing absent particularized suspicion of marijuana use is always unreasonable. They contend that since urinalysis tests do not establish whether an employee's job performance is impaired, the tests bear no rational relationship to the TA's stated interest in public safety. We cannot fully agree with the plaintiffs' contentions.

In this case, we are dealing with what seems to this Court to be a stronger governmental interest than that at issue in *Patchogue–Medford*. There, the State had a legitimate interest in seeing that employees were fit to teach and that their performance was not impaired by drug use. This is obviously important in the context of protecting school children from exposure to teachers who may be using drugs. Here, however, most of New York City's population may be exposed to the risk of physical harm if job performance is impaired due to illegal drug use. Consequently, in appropriate circumstances, this governmental interest may override the employee's interest in privacy, even if the latter is more than "minimal."

Millions of New Yorkers use mass transit daily, not to mention pedestrians and motorists who also are jeopardized if surface transit is not operated safely. Urinalysis testing to uncover drug use by employees or applicants in safety-related positions does not seem unreasonable *per se*, provided safeguards such as those mentioned in *Patchogue–Medford* are established to see that any personal intrusion is no greater than necessary to accommodate the defendants' legitimate interest in public safety.

The plaintiffs contend, in any event, that there is no demonstrated need for testing, since only about 2% of those tested have shown positive results. The plaintiffs note that even this small percent may be overstated because of the possibility of "false positive" results and other inaccuracies in the testing process. Even a small percentage of positive test results raises reasonable concerns, at least to the extent of employees whose jobs could endanger the public. Moreover, when employees know in advance that they will or may be subject

to drug testing, they have an opportunity to refrain from use prior to such tests so that actual usage may be greater.

The defendants argue that, if urinalysis testing is viewed as a search, it is nevertheless reasonable because public employees have a diminished expectation of privacy with respect to their fitness for employment and the TA has an overriding interest in public safety. The defendants also note a legitimate concern about their employees' "turpitude" and poor judgment in using illegal drugs. (However, the defendants apparently do not pursue criminal investigation of any employee who tests positive for drug/marijuana use.) Similar considerations, however, were factored into the *Patchogue–Medford* decision.

■ The defendants further note that a public employer's reasonable conditions of employment are entitled to a presumption of validity. As public employees, the plaintiffs' reasonable expectation of privacy with respect to their fitness for employment may be reduced. Assuming a privacy interest exists, however, it is not totally abrogated by virtue of public employment. Indeed, it is the fact that the employer is a governmental body which supports the fourth amendment claim. *But see supra* note 9 (discussing changing case law regarding restrictions on government as employer).

The significant differences between the cases at bar and *Patchogue–Medford*, along with the important factual matters that remain to be resolved, render a dispositive motion on State constitutional grounds inappropriate at this time.[29]

\* \* \*

Before leaving the search-and-seizure issue, we note the following general observations. Even assuming that the present testing program has some constitutional infirmities, the extent of relief to which the plaintiffs would be entitled cannot be determined upon these motions papers. The plaintiffs are public employees serving the public interest in a matter involving the public's safety. As such, it is hard to envision them as having greater rights than do private parties in closely regulated industries. The plaintiffs argue that the transit system is not a closely regulated industry. At one time, the subways in New York were privately owned but were closely regulated. They now are a State agency involved in an occupation directly concerned with public safety. It would seem that compliance with the laws against illegal drug use should be more rigorous, if anything, for TA employees than for those in privately owned but closely regulated industries.[30]

---

**29.** One collateral issue raised by these motions is the argument of the various plaintiffs that the TA has no basis for attempting to regulate their off-duty conduct, so long as they are not impaired when they report for work. The New York Court of Appeals has held, however, that a "municipality may discipline its employees for actions occurring off duty and off the employer's premises...." *Villanueva v. Simpson*, 69 N.Y.2d 1034, 1035, 517 N.Y.S.2d 916, 917, 511 N.E.2d 60, 61 (1987). The petitioner in that case, a conductor, had committed an assault and failed to obey the lawful order of a police officer while off-duty. *But see IBEW, Local 1900 v. Potomac Elec. Power Co.*, — F.Supp. ——, No. 86 Civ. 717 (D.D.C. March 18, 1986).

**30.** To underscore our point, we again note *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N. J.1986). In that case, the court went to great lengths to distinguish *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), which upheld drug testing of jockeys. The *Capua* court, in striking down the drug-testing policies

of a local fire department, noted that the *Shoemaker* rule was inapplicable since "horse racing[,] unlike fire fighting, is an intensely regulated industry...." *Capua*, 643 F.Supp. at 1518. *See also Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark*, 216 N.J.Super. 461, 524 A.2d 430, 434–35 (App.Div.1987) (discussing distinctions between government and closely regulated industries). We find the lengths to which the *Capua* court and others travel in distinguishing *Shoemaker* ironic, and the logic somewhat troubling. In a sense, government employees aren't intensely regulated; rather, as workers for the government, they are in essence totally regulated (although obviously we do not suggest that plaintiffs lose all privacy expectations by virtue of their government employment). We think a closely regulated business represents a mid-area between a purely private employer, which is presumptively beyond the reach of at least the Federal government, and a public employer. It is, in essence, a quasi-private or quasi-public employer, depending on one's perspective. As such, it loses certain of its private

The Supreme Court recently held that owners of highly regulated businesses have an attenuated expectation of privacy and, where these interests are weakened and the government's interest concomitantly heightened, a warrantless inspection meeting certain criteria is reasonable under the fourth amendment. *New York v. Burger*, — U.S. —, 107 S.Ct. 2636, 2642–44, 96 L.Ed.2d 601 (1987). Moreover, the Court also recently re-emphasized that, in determining the appropriate standard for a search conducted by a public employer in areas in which an employee *has* a reasonable expectation of privacy, the reasonableness of the search depends upon the context within which it takes place and requires a balancing of the employee's legitimate expectation of privacy against the government's need for supervision, control, and efficient operation. *O'Connor v. Ortega,* — U.S. —, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987). As Justice Scalia noted in his concurring opinion to this plurality decision, warrant and probable cause requirements are impractical when dealing with government employees. *Id.* at 1506.

The parties to the instant actions have pursued rather rigid analyses of the competing interests. This, of course, follows the approaches taken by certain courts in several of the cases cited *supra*. It may be that a more balanced approach requires making a distinction between criminal searches and facilitative searches. *See supra* note 9 (discussing growing case law on distinction between government as law enforcer and as employer).

In considering the distinction between criminal searches and facilitative searches, one writer has commented as follows:

> In a criminal search, a law-enforcement official generally must have probable cause to believe that a search of a specific person or area will produce evidence of a crime. The official searches primarily for that reason—not to deter violations generally, nor to help ensure overall compliance with the law.
>
> But when fire marshals inspect a building, or safety inspectors examine a work-

place, they usually do not act because they have probable cause to believe there is a specific violation. Rather, the principal justification for the search is to help obtain general compliance with the law by placing potential violators on notice that their transgressions will not go undetected. Uncovering specific violations is secondary in facilitative searches, and often leads to assistance in correcting problems rather than to punishment.

> The Supreme Court repeatedly has sanctioned such facilitative searches, even in the absence of probable cause to believe (or reasonable suspicion) that a specific violation has occurred. Although a warrant may be required, the court has held that such a warrant does not require probable cause that a specific violation has occurred, but 'probable cause' simply in the sense of a showing that the proposed search complies with a reasonable administrative plan based on neutral criteria.
>
> Thus, governmental testing can be constitutional, even if the urinalyses are intrusive, and even in the absence of reasonable suspicion, if the government first seeks a warrant by showing a reasonable need for such searches, and uses a plan that does not unfairly discriminate. As the Supreme Court put it, such a process provides assurances from a neutral officer that the search is reasonable and is based on fair and neutral criteria.
>
> In the case of drug testing these criteria might include the sensitivity of the job, the incidence of drug use in a worker population based on past testing of the same or similar groups, the length of time since the last test and other similar factors.

Banzhaf, *How to Make Drug Tests Pass Muster*, Nat'l L.J., Jan. 12, 1987, at 13 & 24 (footnotes omitted).

The above may offer a sensible compromise for the competing interests involved, but it is too early to pass judgment without a trial of the issues of fact. As Judge Glasser held in *Railroad Labor Exec. As-*

characteristics, characteristics the government never truly possesses.

*soc. v. Long Island R.R. Co.*, 651 F.Supp. 1284, 1286 (E.D.N.Y.1987):

> The Railroad's alternative position—that the search and seizure is nonetheless reasonable—is not ripe for decision. . . .

> The court cannot perform the balancing test on the present state of the record. For one thing, the dispute over the past history of testing on the Railroad has a bearing on what is reasonable now. Additionally, the court must know the nexus between drug and alcohol use by Railroad employees and danger to lives and property; the reliability of the tests used by the Railroad; the possibility that positive test results will reflect drug or alcohol use in off-duty hours that does not lead to intoxication during working hours; and the circumstances that lead the Railroad to require urine samples to be given under surveillance rather than in private. This list of factors is not meant to be exhaustive. For the reasons stated, the Railroad's motion for summary judgment ... is denied.

### d. Due Process

Among the numerous issues implicated by the parties' motions [31] are an assortment of due process claims raised by the various plaintiffs.

■ First, the *Burka* plaintiffs allege that job applicants are denied due process because they are not provided an opportunity for a hearing or appeal of the drug-testing results which, de facto, render them ineligible for employment. Of course, due process protections apply only when a life, liberty, or property interest protected by the fourteenth amendment are implicated. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). An interest in employment does not rise to the level of a property right until the individual has a "legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. Applicants for positions with the TA have no such property interest under either the Federal or State constitution. *Cassidy*

*v. Municipal Civil Serv. Comm'n*, 37 N.Y. 2d 526, 529, 375 N.Y.S.2d 300, 303, 337 N.E.2d 752, 754 (1975). Plaintiffs seek to patch together such an interest by alleging that N.Y.Civ.Serv.Law § 50(4) (McKinney 1983) vests in "disabled" applicants a right to appeal adverse employment decisions. We already have held, however, that plaintiffs, simply by virtue of their actual or perceived use of marijuana, are not "disabled" as that term is construed under applicable provisions of New York law, including section 50. Section 50 of the New York Civil Service Law, therefore, is inapposite and TA applicants denied employment on the basis of marijuana-positive test results have not been denied a property interest. Accordingly, consistent with *Roth* and *Cassidy*, that portion of plaintiffs' Federal and State due process claim is dismissed.

Next, the *Burka* plaintiffs and Fa challenge the TA's reliance on drug-test results as violative of due process since, they allege, drug-testing technology is inherently imperfect. The defendants move to dismiss these claims.

■ Holding as we do that TA job applicants are not being denied a property right cognizable under either the United States or New York constitution, that part of the claim relating to job applicants is dismissed. As the charge relates to TA employees, this court is far from impressed with this aspect of the due process claim. Plaintiffs do not challenge (and, in essence concede) the fact that TA employees are given adequate administrative hearings and appellate rights comporting with due process. The claim, apparently, is that any reliance on the allegedly arbitrary and inaccurate drug-test results would so infect those proceedings as to render them unconstitutional.

The effectiveness of the tests and the availability of alternative, less intrusive, more effective procedures are somewhat puzzling issues. For example, in *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1518

---

**31.** It takes the defendants nine pages, single spaced, to simply outline the points they have made in support of their motion and in opposition to the plaintiffs' motions.

(D.N.J.1986), Judge Sarokin commented that the state's interest is not impaired by having an individualized reasonable suspicion standard, since one so under the influence of drugs as to impair his or her performance must manifest outward symptoms which, in turn, would give rise to reasonable suspicion. On the other hand, the newspapers are replete with stories of olympic athletes, all-American basketball players and all-star professional football players who are exposed as drug users only after many successful years of competition.

Assuming for the moment that the tests accurately detect the presence of marijuana in a person's system (which the plaintiffs strenuously contest), they do not, it is true, measure the level of use or impairment at the time of testing (as would a blood test for alcohol consumption). On the other hand, the long-term effects of marijuana are not definitively known. Helen Jones and Paul Lovinger, authors of *The Marijuana Question* (1985), argue that marijuana use disqualifies one from a position of responsibility in safety-related matters since, although the intoxication usually lasts only a few hours, the impairment does not end with intoxication. They contend that intoxication can return without further smoking at substantially later periods and, in their opinion, this has been responsible for some transportation accidents. Jones & Lovinger, *Marijuana Doesn't Mix with Rail Safety*, N.Y. Times, Jan. 28, 1987, at A26, col. 4 (letters to the editor). This, along with the questions raised concerning the reliability of the testing, produces factual issues rendering the parties' motions addressed to the *employee's* due process challenge based on the inaccuracy of testing inappropriate at this time.

██ Finally, the *Burka* plaintiffs claim denial of a liberty interest—reputation—without due process in that they are stigmatized by the TA as "drug abusers." Reputation claims under both the United States and New York constitutions must allege publication of the allegedly defamatory material. *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d

684 (1976); *Lentlie v. Egan*, 61 N.Y.2d 874, 875–76, 474 N.Y.S.2d 467, 468, 462 N.E.2d 1185, 1186 (1984). As defendants accurately point out, the mere fact that the TA is aware of the drug-test results "does not establish that such information was publicly disseminated...." *Lentlie*, 61 N.Y.2d at 876, 474 N.Y.S.2d at 468, 462 N.E.2d at 1186. There is no such allegation. Consequently, that claim is dismissed. Plaintiffs are given twenty days to replead if, consistent with Fed.R.Civ.P. 11, a more specific allegation can be made and supported.

*e. The TWU's Fifth Amendment Claim*

██ The TWU claims that, by deeming a refusal to submit to drug testing as an admission of drug use, the TA policy violates the fifth amendment's dictate that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. Amend. V. Among other deficiencies in this claim, the fifth amendment protects only *"testimonial communication that is incriminating."* *Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976) (emphasis in original). We find that the results that would be obtained by drug testing, whether or not compelled, do not constitute testimonial evidence as that term is construed under the fifth amendment. *Cf. Schmerber v. California*, 384 U.S. 757, 760–65, 86 S.Ct. 1826, 1830–33, 16 L.Ed.2d 908 (1966) (holding blood sample does not constitute compelled testimony).

Plaintiffs place great reliance on Judge Collins' decision in *National Treasury Employees Union v. Von Raab*, 649 F.Supp. 380 (E.D.La.1986), which distinguished *Schmerber* and held that urinalysis does violate the fifth amendment's privilege against self-incrimination. *Id.* at 388. The Fifth Circuit, however, consistent with our holding today and expressly relying on *Schmerber*, has since reversed Judge Collins on that point. *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 181 (5th Cir.1987).

Further, even if urinalysis results could somehow be construed as compelled testimony within the ambit of the fifth amend-

ment, the results in this case would not be obtained as part of a criminal investigation, nor do plaintiffs make any allegation that the results would be so used. This fact further erodes the foundation for the TWU's challenge. *See McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924) (noting fifth amendment implicated only if testimony likely to involve criminal sanctions).

For these reasons, the TWU's fifth amendment challenge is dismissed.

### f. Fa's Collateral Estoppel Claim

█ Plaintiff Fa seeks summary judgment on his claim that the determination by an administrative law judge, awarding Fa unemployment benefits partly on the basis of Fa's "credible and consistent testimony" denying marijuana use, collaterally estopped the TA from "relitigating" the drug issue during Fa's disciplinary proceedings.

If collateral estoppel were to apply in this context, the court would have to make a determination as to the nature of the unemployment proceeding (*i.e.*, whether it was adversarial and whether the parties were represented by counsel) and whether the drug issue received a full hearing. *Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552 (2d Cir.1986). Those considerations present factual issues that render Fa's motion premature. We might add, however, that we are not so sure, based on a cursory reading of applicable law, that this claim can survive an appropriate motion for summary judgment by *defendants*. We, of course, reserve decision on that issue until the appropriate time.

### g. Intervenor Salazar's Substantial Evidence Challenge

█ Intervenor Salazar seeks summary judgment on his specific challenge to the "substantial evidence" standard used by the TA trial board in sustaining adverse employment action taken on the basis of positive urinalysis results. Salazar claims that the TA's use of a "substantial evidence" standard violated N.Y.Civ.Serv.Law § 75 (McKinney 1983), which he maintains requires use of a "preponderance of the evidence" standard in that context. He further contends that this alleged violation ran afoul of the due process requirements of the United States and New York constitutions.

The standard applied cannot be evaluated except within the context of the hearing itself. Like Fa's collateral estoppel claim, this presents factual determinations that make the claim unsuitable at this time for summary judgment. Accordingly, Salazar's motion is denied.

## CONCLUSION

Defendants had requested that we decline to exercise pendent jurisdiction and dismiss all State claims. There is a substantial Federal claim in this case (fourth amendment), however, and all claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Consistent with *Gibbs* and sound principles of judicial economy, we choose to exercise pendent jurisdiction over the asserted State claims.

In that context, and for the reasons articulated above, all plaintiffs' motions for summary judgment are denied, and all claims, Federal and State, are dismissed with the exception of:

(1) those claims asserting search-and-seizure violations under the fourth amendment of the United States Constitution and article 1, section 12 of the New York Constitution;

(2) those claims asserting a violation of privacy rights under the Federal or State constitution;

(3) the Federal or State due process claims of employees only (and not job applicants), and, of those claims, only those relating to the inaccuracy and inherent unfairness of drug testing;

(4) Fa's collateral estoppel claim; and

(5) Salazar's substantial evidence claim.

All other claims are dismissed with prejudice, excepting the due process claim relating to reputation. Plaintiffs are allowed

twenty days to replead that issue if a cognizable Federal claim can be asserted (bearing in mind the requirements and sanctions of Rule 11).

As one commentator has observed: "The legal issues concerning substance abuse in the workplace are for the most part largely unsettled and thus are not subject to the application of clearly defined legal precedents." Baer, *Labor Relations: Substance Abuse*, N.Y.L.J., June 5, 1987, at 1, col. 1. Of course, more definitive rulings from the United States Supreme Court or the Second Circuit Court of Appeals could clarify the situation. Otherwise, this case will clearly require an extensive evidentiary hearing. Indeed, it may prove appropriate to refer the matter to a Special Master for the development of an evidentiary record since, in light of the requirements of the Speedy Criminal Trial Act, insufficient time is available for such lengthy civil proceedings.

SO ORDERED.