UNITED STATES of America,
Plaintiff–Appellee,

v.

SOUTHERN MANAGEMENT
CORPORATION, Defendant–
Appellant.

No. 90–2496.

United States Court of Appeals,
Fourth Circuit.

Argued July 31, 1991.

Decided Feb. 3, 1992.

Stephen Anthony Horvath, Lewis, Trichilo & Bancroft, P.C., Fairfax, Va., argued (Howard R. Porter, Lewis, Trichilo & Bancroft, P.C., Fairfax, Va. and Michael Winer, Silver Spring, Md., on brief), for defendant-appellant.

Miriam Rachel Eisenstein, U.S. Dept. of Justice, Washington, D.C., argued (John R. Dunne, Asst. Atty. Gen., Jessica Dunsay Silver, U.S. Dept. of Justice, Washington, D.C., Henry E. Hudson, U.S. Atty., Dennis Edward Szybala, Asst. U.S. Atty., Alexandria, Va., and John Adam Martin, III, Asst. County Atty., County Attorney's Office of County of Fairfax, Fairfax, Va., on brief), for plaintiff-appellee.

Michael R. McAdoo and Francis H. Young, Falls Church, Va., on brief, for amicus curiae.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

## OPINION

K.K. HALL, Circuit Judge:

Southern Management Corporation ("SMC") appeals the judgment entered against it for compensatory and punitive damages, civil penalties, and injunctive relief. We vacate the award of monetary damages and penalties, but affirm the injunction.

### I.

The Fairfax–Falls Church Community Services Board ("Board") operates the Crossroads drug and alcohol abuse program in Alexandria, Virginia. During the first phase of the program, the Board's clients live at the Crossroads facility, receive counseling and therapy, and are tested for drug use on a regular basis. After a drug-free year, each client is evaluated for suitability for the second, or "reentry," phase of the program. In this reentry phase, clients live in apartments rented by the Board, while continuing to be supervised and monitored by Crossroads employees. This supervision includes twice-monthly drug tests. Clients in phase two who test positive for drugs or violate other program rules are discharged from the program and evicted from the Board-rented apartment.

SMC manages a number of apartment complexes in the District of Columbia metropolitan area, including the Kings Gardens complex in northern Virginia. In July 1989, SMC employees at Kings Gardens were approached by Crossroads officials about leasing apartments for use in phase two of the treatment program. Although the specifics of these contacts were disputed, the bottom line is that the Board was unable to lease any units. The United States then brought this action under the Fair Housing Act, 42 U.S.C. § 3601 et seq. (1990) ("Act"), claiming that SMC's refusal to rent to the Board constituted illegal discrimination against handicapped individuals. In a pivotal ruling on cross-motions for summary judgment, the court ruled that the Board's clients were handicapped and were covered by the Act. A jury returned a verdict in which it found no pattern or practice of discrimination. However, the jury did find that SMC violated the rights of the Board's clients and awarded the Board compensatory damages of $10,000. The jury further assessed punitive damages against SMC in the amount of $26,280, and judgment was entered against SMC for these amounts on September 26, 1990.

In addition, the district court assessed a $50,000 penalty against 3388 102 1 SMC, pursuant to the authority conferred by 42 U.S.C. § 3614(d)(1)(C) (1990). The court also enjoined SMC from future discrimination against handicapped persons; specifically, SMC was ordered to rent to the Board for occupancy by Board clients in the reentry phase of the Crossroads program. The injunction order sets forth a detailed procedure governing Board rentals. Each prospective tenant from Crossroads may be interviewed by SMC and subjected to the same suitability criteria as other prospective tenants, and continued occupancy is dependent on adherence to apartment rules to the same extent as other tenants. The Board is required to closely supervise its client-tenants, and SMC must be provided with a telephone number at which the Board can be contacted 24 hours a day should problems arise concerning any client-tenant.

SMC appeals both the judgment entered on the jury verdict and the judgment imposing the penalty. Although the specific elements of the injunction are not challenged on appeal, the legal underpinning for the injunction, i.e., that the Act prohibits discrimination against the Board's clients, is the threshold issue, which, if decided in SMC's favor, would topple the injunction along with the damage awards and the penalty. We turn first to this threshold issue.

## II.

The first obstacle to the government's case was whether the phase two clients, allegedly "recovering addicts" and other former drug users who had completed at least one drug-free year in phase one, came within the Fair Housing Act's definition of "handicap." In 1988, the Fair Housing Act of 1968 was overhauled. Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, 102 Stat. 1619 (1988). Prior to the amendments, the Fair Housing Act prohibited various forms of housing-related discrimination based on "race, color, religion, or national origin." Pub.L. No. 90–284, Title VIII, § 804, 82 Stat. 83 (1968). In 1974, discrimination based on sex was added. Pub.L. No. 93–383, Title VIII, § 808(b)(1), 88 Stat. 729 (1974). In 1988, prohibitions against housing discrimination based on "familial status" or "handicap" were added to the Act. Pub.L. No. 100–430, § 6, 102 Stat. 1619, 1620–21 (1988). The terms "familial status" and "handicap," having meanings less concrete than "race, color, religion, sex, or national origin," required further definition. Congress' attempt to deal with drug use/addiction under the "handicap" rubric sowed the seeds of this litigation.

The source of the dispute lies in the following definition added by § 5(b) of the 1988 amendments (codified at 42 U.S.C. § 3602(h) (1990)):

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment,

but such term does not include current, illegal use of or addiction to a controlled substance as defined in section 802 of Title 21.

Basically, SMC's argument is that (1) the Board's clients do not meet the general definition of "handicap" in subsections (h)(1)–(3), and (2) even if they do, they are excluded by the proviso at the end of the section. Before addressing the drug user/addict exclusion, we must first determine whether the clients even fall within the general definition of "handicap" under § 3602(h)(1)–(3).

## III.

This issue of statutory interpretation first arose during the discovery phase of the litigation. SMC propounded a request for the production of extensive records of the Board's clientele, including records concerning intake, treatment, and prior criminal history. The government objected, arguing that such information was confidential under 42 U.S.C. § 290dd–3 and § 290ee–3. These statutes safeguard the confidentiality of the records of patients at substance abuse centers. An exception to nondisclosure is that a court order may be issued for good cause after the court has weighed the various interests involved.

SMC countered that production was warranted because it was entitled to know whether any prospective tenants were still using drugs, whether any would pose a threat to other tenants at Kings Gardens, whether any were still "addicted" after completion of phase one, and whether the dependency problem of any prospective tenant was such that it did not impair any "major life activities" of that client. In short, SMC was attempting to prove that its refusal to lease to the Board was justified because all or some of the clients were not covered by the Fair Housing Act. The district court resolved the discovery issue by entering a protective order that required production of records of only the eight clients for whom the apartments were initially sought. The only records required to be produced were those pertaining to current use of drugs, past convictions for the manufacture or distribution of illegal drugs, and a physician's diagnosis of drug abuse. Further, the names of the individual clients were redacted, foreclosing any independent background investigations by SMC.

SMC posits as error the government's failure to demonstrate how *each* client initially slated for an apartment at Kings

Gardens had a substantial limitation of "one or more ... major life activities." The government responds in a conclusory fashion to the effect that if the clients were in rehabilitation, they must *ipso facto* be impaired to a significant degree.[1] *See Burka v. New York City Transit Authority*, 680 F.Supp. 590, 600, n. 18 (S.D.N.Y. 1988) (suggesting that one who seeks treatment for a drug-dependency problem is handicapped within the meaning of the Rehabilitation Act). Although this facet of the argument receives only cursory treatment in the briefs, we feel that extended discussion is helpful to an understanding of our later discussion of the drug use/addiction exclusion.

■ Whether or not a particular person is handicapped is usually an individualized inquiry. *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir.1986) (decided under the Rehabilitation Act of 1973). This individualized approach was short-circuited in the instant case when the district court granted summary judgment to the government on the issue of whether the Board's clients fell within the definition of handicap at 42 U.S.C. § 3602(h). The court did so at this early stage in the litigation despite the limited information about the particular clients slated for initial tenancy. Notwithstanding the court's refusal to allow SMC to conduct a more in-depth client-by-client inquiry, we do not find the court's ruling in this regard to have been premature or otherwise erroneous.

■ In our view, whether any individual client is now or was ever substantially limited in one or more "major life activities" is immaterial. Months prior to SMC's refusal

to lease to the Board, the Department of Housing and Urban Development ("HUD") issued its final rule implementing, *inter alia,* the handicap discrimination sections of the 1988 amendments to the Act.[2] See 54 Fed.Reg. 3283, Jan. 23, 1989 [now designated as 24 C.F.R., Part 100 Subpart D (1990)]. These regulations, much of the language of which is borrowed directly from regulations under the Rehabilitation Act of 1973, provide that the second and third alternatives under the statutory definition of handicap, "(2) has a record of such an impairment, or (3) is regarded as having such an impairment," are intended to mean the following:

(c) "Has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(d) "Is regarded as having an impairment" means:

(1) Has a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation;

(2) Has a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (a) of this definition but is treated by another person as having such an impairment.

24 C.F.R. § 100.201(c), (d). In the context of this case, we believe that subsection (d)(2) provides a complete answer to our initial inquiry.

---

1. Congress expressed an intent that the Fair Housing Act's definition of "handicap" be interpreted consistently with the regulations regarding the same term in the Rehabilitation Act of 1973. H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), reprinted in 1988 U.S.Code Cong. & Admin.News 2173, 2183; see p. 919, infra. In its brief to this court, the government states that regulations promulgated by the agencies entrusted with implementation of the Rehabilitation Act of 1973 "include[d] drug addiction and alcoholism in the definition of 'handicap.'" Government Brief at 10. The authorities cited

for this proposition, 28 C.F.R. § 41.31(b)(1) (1990) and 28 C.F.R. § 39.103(1)(ii) (1990), say no such thing. Instead, under each of these sections, drug addiction and alcoholism are conclusively deemed to constitute a "physical or mental impairment." The cited regulations do *not* give a definitive answer to the second step of analysis, i.e., does the impairment substantially limit a major life activity?

2. The 1988 amendments became effective March 12, 1989. Pub.L. No. 100–430, § 13(a), 1988 U.S.Code Cong. & Admin.News (102 Stat.) 1619, 1636.

In *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court rejected the argument that only an impairment that results in diminished physical or mental capabilities could be considered a handicap under § 504 of the Rehabilitation Act. The Court reasoned that the "negative reactions of others to the impairment" could limit a person's ability to work regardless of the absence of an actual limitation on that person's mental or physical capabilities. *Id.* at 283, 107 S.Ct. at 1128. For our purposes, *Arline* can be seen as having effectively expanded the scope of the term "limitation on major life activities" to include limitations on one's capability to maintain or *obtain* a job as well as the ability to perform a job.

The inability to obtain an apartment is, we feel, on a par with the inability to obtain a job. Once the focus of "limitation of major life activities" is expanded to include restraints imposed not only on a person's ability to perform, but also on the opportunity to obtain benefits integral to a person's ability to function generally in society, the Board's clients clearly satisfy the first portion of the definition of handicap. Can we then disregard the entire question of the existence and extent of the prospective tenants' functional limitations, and look instead at this "external limitation" imposed by SMC? We believe so.

With the benefit of hindsight, we can see that there is no question that SMC denied housing to the Board on the basis of the substance abuser status of the prospective tenants and the perception that they would be undesirable tenants; the jury verdict puts this issue beyond dispute. In the jury charge, the district court instructed the jury as follows: "If you find a decision by [SMC] not to lease apartments to the Crossroads program was based on reasons other than the handicaps of the individuals in the Crossroads program, then you may find your verdict in favor of [SMC]. That is, that the defendant did not discriminate against Crossroads on the basis of the handicap of the residents of Crossroads." In response to an interrogatory, the jury answered "yes" to the question "[d]o you find by the preponderance of the evidence that the defendant has denied rights to a group of persons in violation of the Fair Housing Act?"

We believe that, apart from the more legalistic question of whether or not the clients are handicapped, the only fair-minded interpretation of this jury determination is that, as a matter of fact, SMC refused to rent to the Board because the prospective tenants were former substance abusers. If the word "handicap" were replaced by "substance abuse problem" in the instruction, the jury's answer would have been the same.

The clients are clearly impaired,[3] and their ability to obtain housing (a major life activity) was limited by the attitudes of the SMC officials. Thus, we conclude that the clients qualify as having a handicap under the general definition at 42 U.S.C. § 3602(h)(1)–(3). We turn next to the exclusion.

### IV.

Congressional intent was to treat drug abuse and addiction as significant impairments that would constitute handicaps unless otherwise excluded. The 1988 amendments contain three exclusions:

(1) "current, illegal use of or addiction to a controlled substance ..." 42 U.S.C. § 3602(h);

(2) "direct threat to health or safety of other individuals or [individuals] whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9); and

(3) "[conviction] by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance...." 42 U.S.C. § 3607(b)(4).

The first exclusion, "current use of or addiction to a controlled substance," was the

---

**3.** SMC as much as concedes that all of the Board's clients meet the minimum threshold of being impaired. Ample evidence demonstrated that the Crossroads program admitted only drug abusers with the most serious dependency problems.

focus of the summary judgment proceedings, and it continues to predominate on appeal.

In deciding the cross-motions for summary judgment, the district court found that the Board's clients for whom the apartments were sought "are handicapped persons within the meaning of 42 U.S.C. § 3602(h), and that such persons being in the Re-entry Phase of their rehabilitation program are not current, illegal users of or addicted to controlled substances." In explaining this ruling from the bench, the court expressed the opinion that the statute was "a little ambiguous" with regard to whether the re-entry level clients fell outside the "addiction" exclusion. However, the district court pointed to the legislative history, HUD regulations, and the remedial nature of the statute in concluding that re-entry level clients were among the intended beneficiaries of the Act. The second part of the threshold issue is the breadth of the statutory exclusion of "addiction" from the definition of handicap.

■ Statutory interpretation always begins (and often ends) with the words of the statute itself. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the words convey a clear meaning, courts may not sift through secondary indices of intent to discover alternative meanings. The language of the exclusion proviso in the definition of "handicap," however, demands recourse to some other source of legislative intent.

■ The "term [handicap] does not include current, illegal use of or addiction to a controlled substance...." 42 U.S.C. § 3602(h) (1990). The grammar of this sentence erects a formidable stumbling block. SMC contends that the word "current" modifies only "use" and not "addiction," so that "addiction" is not divisible into two categories: (1) "current" addiction (which would be excluded) and (2) "former" addiction (which would not be excluded). If the term "current ... addiction to" includes only those persons who are addicted to *and* currently using illegal drugs, then the word "addiction" is superfluous because "current use" subsumes both addicts and non-addicts. To avoid such superfluity, SMC argues that "addiction" must include persons addicted to, but no longer using, controlled substances. In short, SMC contends that once an addict, always an addict, and addicts may not seek the Act's protection.

The government, on the other hand, contends that the term "addiction" has both a common and a medical definition. As a medical matter, addiction is a chronic illness that is never cured but from which one may nonetheless recover. In a non-medical sense, however, an addict is one who, because of a physiological or psychological compulsion, is currently using drugs. The government argues that the district court properly made recourse to other sources of legislative intent when confronted with this ambiguity.

While much of the expert testimony below supports SMC's argument that the status of addiction, once attained, may never be cast off, other founts of intent indicate that "addiction" was not used in a strict medical sense. One dictionary defines "addiction" as "the quality or state of being addicted; specifically: the compulsive uncontrolled use of habit-forming drugs beyond the period of medical need or under conditions harmful to society," and "addict" is defined as "one who is addicted to a habit; specifically: one who habitually uses and has an uncontrollable craving for an addicting drug." Webster's Third International Dictionary (1976).[4] We agree that the language is ambiguous. In our view, the question is whether a person who was previously using *and* is addicted to illegal drugs may, after a period of abstinence and

---

4. The exclusion proviso refers to 21 U.S.C. § 802 for the definition of "controlled substances." This section, however, also includes the following definition of "addict:"

   (1) The term "addict" means any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

rehabilitative efforts, be said to no longer have an "addiction," as that term is used in the statutory exclusion.

The House report submitted with the proposed amendments to the Fair Housing Act, which report remained unchanged in the Senate substitute, makes reference to "current addicts" and unequivocally expresses the intent *not* to exclude "recovering addicts:"

> The Committee intends that the definition [of "handicap"] be interpreted consistent with regulations clarifying the meaning of the similar provision found in Section 504 of the Rehabilitation Act.
>
> The definition adopted by the Committee makes it clear that current illegal users of or addicts to controlled substances, as defined by the Controlled Substances Act, are not considered to be handicapped persons under the Fair Housing Act. This amendment is intended to exclude current abusers and current addicts of illegal drugs from protection under this Act. The definition of handicap is not intended to be used to condone or protect illegal activity.

> \*　\*　\*　\*　\*　\*

Similarly, individuals who have a record of drug use or addiction but who do not currently use illegal drugs would continue to be protected if they fell under the definition of handicap. The Committee does not intend to exclude individuals who have recovered from an addition [sic] or are participating in a treatment program or a self-help group such as Narcotics Anonymous. Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

Individuals who have been perceived as being a drug user or an addict are covered under the definition of handicap if they can demonstrate that they are being regarded as having an impairment and that they are not currently using an illegal drug.

The exception for current illegal drug users does not affect their coverage in the Rehabilitation Act or other statutes. The World Health Organization and the American Psychiatric Association both classify substance abuse and drug dependence as a mental disorder, and most medical authorities agree that drug dependence is a disease. Indeed, Congress has defined the term "handicap" in the Rehabilitation Act to include drug addiction[5] and to require that federal employers as well as recipients of federal financial assistance recognize drug addiction as a handicap.

H.R.Rep. No. 711, 100th Cong., 2d Sess. (reprinted in 1988 U.S.Code Cong. & Admin.News 2173, 2183).

Rather than recognizing a continuum of addiction extending from current use through "recovery," the committee report seems to recognize only two categories: current addicts and recovered, or former, addicts. This latter category includes "former drug dependent persons," "individuals who have recovered from an addiction," "[individuals who] are participating in a treatment program," and persons with "a record of drug use or addiction but who do not currently use illegal drugs." Nowhere does the report attempt to differentiate

---

5. The Committee overstates the degree of clarity in the Rehabilitation Act. At the time the report was issued, the Rehabilitation Act contained the same general definition of "handicap" (e.g. a physical or mental impairment which substantially limits one or more major life activities), but it excluded the following individuals with regard to the statute's sections on employment discrimination:

> For purposes of sections 503 and 504 as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

Pub.L. No. 95–602, Title I, § 122(a), 92 Stat. 2984–85 (1978). This exclusion makes no reference to drug *addiction*.

these concepts. For instance, is a participant in a treatment program deemed to have "recovered from an addiction?" If so, does the addict immediately enjoy the protection of the Fair Housing Act upon embarking on a treatment program, or is some period of abstinence necessary as well? The limitations placed on SMC's discovery of individual client information foreclosed any attempt at trial to demonstrate, for instance, that prospective tenant A had participated in but failed other treatment programs despite abstinence of a year or so.[6] The report seems to open the door to at least some addicts, but how far is unclear.

While the committee report appears to refute SMC's argument that all addicts are per se excluded, we are not willing to say that SMC's statutory-construction argument is without any merit. In expanding the scope of the Fair Housing Act to protect handicapped individuals, Congress was not addressing the question of addiction-as-handicap for the first time. A possibly new distinction, between current and former addicts, was being drawn, but with little assistance to help distinguish the two. Moreover, the housing arena is qualitatively different from those in which the issue had been addressed previously. The "former," "recovered," or "recovering" addict was to be given equal access to housing; in other words, someone who as a medical matter will always have a craving for narcotics, but who has been able to control that craving for some (undefined) period of time, must not be denied access to housing on the basis of that craving and its attendant dangers. The thrust of the statute is laudable, but SMC's position in late 1989 was a tenable one.

In any event, we believe that legal developments occurring subsequent to the events at Kings Gardens place the matter beyond dispute. The Americans with Disabilities Act of 1990 ("ADA"), Pub.L. No. 101–336, 104 Stat. 327 (1990) was enacted by Congress and made effective July 26, 1990, more than six months after the complaint against SMC was filed by the government. The ADA was aimed at discrimination against the handicapped in four broad areas: transportation, public accommodations, telecommunications, and employment. The ADA amended the Rehabilitation Act to clarify that current *users* of illegal drugs would not be covered, but that the following individuals would not be excluded:

(C)(i) For purposes of subchapter V of this chapter, the term "individual with handicaps" does not include an individual who is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use.

(ii) Nothing in clause (i) shall be construed to exclude as an individual with handicaps an individual who—

(I) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

(II) is participating in a supervised rehabilitation program and is no longer engaging in such use; or

(III) is erroneously regarded as engaging in such use, but is not engaging in such use;

*Id.* at § 512(a) (codified at 29 U.S.C. § 706(8)(C) (1991)). For the first time, then, Congress had specifically referred to mere participation in a drug rehabilitation program (coupled with non-use) as an adequate basis for inclusion in the definition of "handicap" in the Rehabilitation Act. The explicit focus on successful rehabilitation and supervised programs assures us that Congress accepts the concept of a rehabilitated addict. Given the congruity of purpose behind the various antidiscrimination statutory schemes, this later expression of intent in a related statute should inform our inquiry. Therefore, we hold that the exclusion from the definition of "handicap" of "current, illegal use of or addiction to a

---

**6.** At trial, reference was made to the deposition testimony of Dr. Joan Volpe, the director of alcohol and drug programs for the Board, in which she asserted that 99–100% of the Crossroads clients had failed other programs.

controlled substance" shall be construed consistently with 29 U.S.C. § 706(8)(C)(ii)(I)–(II). *Cf. Burka v. New York City Transit Authority,* 680 F.Supp. 590, 600 n. 18 (S.D.N.Y.1988) (suggesting that Congress viewed the terms "drug addict" and "drug abuser" as interchangeable in the Rehabilitation Act).

## V.

■ We decide the threshold issue, then, in the government's favor: the Board's clients are not excluded from the definition of "handicap." The jury's answer to the interrogatory satisfies us that SMC's liability has been established. The remaining general issue, then, is what relief is warranted. For the reasons that follow, we believe that the facts of this case are unusual enough for us to fashion a somewhat irregular disposition of the case. We feel that this disposition achieves substantial justice and serves the ends of judicial economy.

This is clearly a test case designed to establish the rights of drug abusers/addicts under the Fair Housing Act, and the Department of Justice has devoted no small amount of effort to this end. SMC will henceforth be required to follow the requirements of the injunction, and it does not now question the specific elements of this portion of the lower court's judgment. The conduct of SMC was, as we have determined, violative of the Board's clients' rights, but we feel that SMC's actions do not warrant monetary relief, in light of the ambiguity in Congress' statutory exclusion of those "addicted."

In determining the appropriate relief in this case, we are motivated by equitable considerations. *Cf. United States v. Estate of Donnelly,* 397 U.S. 286, 296–97, 90 S.Ct. 1033, 1039–40, 25 L.Ed.2d 312 (1970) (Harlan, J., concurring) (espousing retroactive application of new rules tempered by a flexible approach to fashioning remedies in cases affected by new rules); *James B. Beam Distilling Co. v. Georgia,* —— U.S.

——, 111 S.Ct. 2439, 2448, 115 L.Ed.2d 481 (1991) (noting that the rejection of "modified prospectivity" did not "preclude[ ] consideration of individual equities when deciding remedial issues in particular cases.") (Souter, J., announcing judgment of the Court); *Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1310 (9th Cir.1990) (exercising appellate court's "authority to reduce the award prior to remand in the interest of justice and to preserve judicial resources.").

Our ruling is fair notice regarding the ambit of the Act's coverage of drug addicts/abusers. The Rehabilitation Act's current definition, 29 U.S.C. § 706(8)(C)(ii)(I–III) (1991), should serve as a definitive guidepost for all future controversies under the Fair Housing Act. We emphasize that our ruling is fairly narrow in its scope. We hold that 42 U.S.C. § 3606 does not *per se* exclude from its embrace every person who could be considered a drug addict. Instead, we believe that Congress intended to recognize that addiction is a disease from which, through rehabilitation efforts, a person may recover, and that an individual who makes the effort to recover should not be subject to housing discrimination based on society's "accumulated fears and prejudices" associated with drug addiction.[7]

AFFIRMED IN PART AND REVERSED IN PART.

---

7. In overturning the damage award and the penalty, we express no views regarding two related issues argued by the parties: (1) the legality of awarding a penalty in addition to punitive damages, and (2) the use of "lost bed days" as a measure of compensatory damages. These issues may possibly be raised before us again, but we decline to decide them today.