**Alex VEDERNIKOV, M.D., Plaintiff,**

**v.**

**WEST VIRGINIA UNIVERSITY, Defendant.**

**Civil Action No. 1:97–CV–80.**

United States District Court, N.D. West Virginia, Martinsburg Division.

May 20, 1999.

F. Benjamin Riek, Riek & Associates Co., LPA, Cleveland, OH, for plaintiff.

Richard M. Yurko, Jr., Steptoe & Johnson, Clarksburg, WV, Jon A. Reed, Morgantown, WV, for defendant.

### MEMORANDUM OPINION AND ORDER

BROADWATER, District Judge.

On March 11, 1999, the above-styled matter came before the Court for consid-

eration of the defendant's motion for summary judgment (Documents #25). The parties appeared by their respective counsel of record and presented oral arguments in support of their respective memoranda of law. After considering the above, the Court is of the opinion that the defendant's motion for summary judgment (Document #25) should be **GRANTED**

## I. FACTS

From July 1993 through February 1995, Alex Vedernikov ("Plaintiff") was a resident in the West Virginia University ("Defendant" or "WVU") Anesthesiology Residency Program. On November 29, 1994, an empty fentanyl syringe was found in the men's locker room adjacent to the operating rooms of the West Virginia University Hospital ("Hospital"). Fentanyl is a controlled substance commonly used as an anesthetic drug. As a result, Hospital representatives conducted a drug screen of all operating room male employees, including the plaintiff. Plaintiff's urine tested positive for fentanyl and its metabolites.

On December 15, 1994, the date plaintiff was relieved of his duties, defendant conducted an intervention meeting headed by Dr. Stulken ("Stulken"), chairman of the Department of Anesthesiology, Dr. John J. Barbaccia ("Barbaccia"), Director of Resident Training, and Dr. Frank Schiebel, a member of the Physicians Health Care Committee. Plaintiff initially denied using fentanyl when confronted by Stulken, but he later admitted to Barbaccia that he used fentanyl. At the intervention meeting, Stulken offered plaintiff two options: (1) immediate employment termination, or (2) compliance with the intervention committee's recommendations of enrollment in a drug treatment program. Plaintiff opted for compliance with the intervention committee.

On December 19, 1994, plaintiff entered Talbott Marsh Recovery Center ("Talbott") in Atlanta, Georgia for in-patient drug treatment. Talbott representatives advised defendant that the treatment would last approximately one month and would cost approximately $13,000.00. Defendant agreed to pay for plaintiff's treatment to the extent that it exceeded plaintiff's insurance coverage, which covered the initial $10,000.00. Upon admission to Talbott, plaintiff admitted to the physicians in charge of his treatment that he had abused fentanyl in the past. Talbott's representatives contacted Dr. Robert E. Johnstone ("Johnstone"), then acting chairman of the Department of Anesthesiology, and Barbaccia about the need to prolong plaintiff's treatment. According to Talbott's representatives, plaintiff would need an additional four to five months of treatment at a cost exceeding $50,000.00 because of plaintiff's denial and resistance to treatment. Plaintiff's progress notes at Talbott indicated that the plaintiff was "in profound denial" of drug use and was "biding his time."[1] Plaintiff was discharged from Talbott for being "treatment resistance."[2] Plaintiff remained at Talbott until January 22, 1995. On plaintiff's discharge summary, the treating physician identified four primary problems during the course of plaintiff's treatment. Under problem #1, "continued, compulsive use of fentanyl," the treating physician stated:

[Plaintiff] made little progress in treatment at [Talbott] during the time he was here. He indicated that he saw his fentanyl use as experimentation and that his use was not an issue and that he did not feel he was an addict. He also indicated that he felt he had nothing to work on in treatment, but would go through the issues on his treatment plan in perfunctory compliance.

**1.** Progress notes dated January 17, 1995. Defendant's Exhibit #6.

**2.** Dr. Barry H. Lubin's letter, Director of Continuing Care at Talbott, dated January 23, 1995. Defendant's Motion for Summary Judgment, Exhibit #8.

Talbott's Discharge Summary, dated January 23, 1995. Defendant's Motion for Summary Judgment, Exhibit # 7 at 2.

After the plaintiff returned from Talbott, the defendant referred plaintiff to an out-patient treatment program at Chestnut Ridge Hospital under Dr. Rolly Sullivan's ("Sullivan") supervision. Defendant sponsored the out-patient treatment through the Employee Assistance Program ("EAP") and the Physicians Health Care Committee ("PHCC"). On February 3, 1995, at the plaintiff's initial evaluation intake, Sullivan stated that plaintiff had an "opioid dependence in early full remission."[3] Sullivan devised a seven-step treatment plan that included individual and family therapy, random urine drug screens, and follow up measures. Sullivan stated that once the seven-step treatment was in place, he would

> See no reason why [plaintiff] could not be entered back into a safe environment at work. The operative word here is safe and I would put him in either a nonclinical service or a clinical service which IV(sic) or opioids are not readily available.

Sullivan's Psychiatric Intake Evaluation, dated February 3, 1995. Defendant's Motion for Summary Judgment, Exhibit # 9 at 3.

On February 13, 1995, Sullivan reported plaintiff's evaluation to the members of the PHCC. As a result of Sullivan's report, the PHCC recommended that plaintiff "be allowed to return to work in a research position, without access to narcotics and without patient contact."[4] Following this meeting, the PHCC Chairman, John V. Linberg ("Linberg"), informed Johnstone

that plaintiff "be allowed to return to work in a non-clinical research setting. It will be critical that he not have any direct access to drugs, unless he is under immediate supervision during this exposure."[5] Johnstone previously discarded the possibility of placing the plaintiff at the anesthesia research laboratory, headed by Dr. David J. Smith ("Smith"). Smith indicated that at the anesthesia research plaintiff would have access to narcotic and addictive drugs. Unlike the operating room, where drugs are secured and accounted for by a pharmacist, drugs in the research laboratory are more readily available because drugs are not individually controlled. As a result, Johnstone believed that assignment to the anesthesia research laboratory was not a valid option under the circumstances because it offered unchecked access to controlled substances. Johnstone considered other possible placement options, including transferring plaintiff to a different residency program at WVU. Because plaintiff desired to stay in anesthesia, none of the available options met Sullivan's recommendations.

On February 24, 1995, as a result of the unavailability of non-clinical positions, Johnstone discharged the plaintiff. On his discharge letter, Johnstone stated that plaintiff was discharged "due to [his] conduct that substantially impairs [his] ability to fulfill [his] responsibilities in the residency program."[6] After his discharge, plaintiff retracted his admission that he had used fentanyl. Plaintiff explained that the reason he told Sullivan, Barbaccia, and Johnstone that he wrongly admitted to using fentanyl was to maintain his employment and the prospects of returning to residency training.[7] The plaintiff then ap-

3. Dr. Rolly Sullivan's Psychiatry Intake Evaluation, dated February 3, 1995. Defendant's Motion for Summary Judgment, Exhibit # 9 at 3.

4. Physicians Health Care Committee Minutes, dated February 13, 1995. Defendant's Motion for Summary Judgment, Exhibit # 11.

5. Letter from Dr. John V. Lindberg, Chairman of Physicians Health Care Committee,

dated February 12(sic), 1995. Defendant's Motion for Summary Judgment, Exhibit # 12.

6. Dr. Robert E. Johnstone's letter, dated February 24, 1995. Defendant's Motion for Summary Judgment, Exhibit # 13.

7. Alexander Vedernikov's deposition. Defendant's Motion for Summary Judgment, Exhibit # 3 at 56–58.

plied for and accepted a position in an anesthesiology residency program at State University of New York. Johnstone and Barbaccia wrote letters of recommendation, but they included in the letters the fact that plaintiff had tested positive for fentanyl. Plaintiff graduated from that program and is now a staff anesthesiologist elsewhere. On December 8, 1995, plaintiff filed a Complaint of handicap and national origin discrimination with the West Virginia Human Rights Commission ("WVHRC"). The WVHRC found no probable cause for plaintiff's charges. On April 21, 1997, plaintiff filed the present action, alleging national origin discrimination under Title VII of the Civil Rights Act of 1964 (Count I), handicap discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 (Count II), and breach of contract under West Virginia law (Count III). Plaintiff later surrendered his claim of national origin discrimination (Count I). This Court previously dismissed plaintiff's breach of contract (Count III). Thus, handicap discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 (Count II) is the only count surviving and the object of this memorandum opinion and order.

## II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing that there are no issues of material fact in dispute. *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393 (4th Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In *Celotex*, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after ade-

quate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. 2548. A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Id.* at 324, 106 S.Ct. 2548.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir.1994), the Fourth Circuit reiterated the standard for summary judgment as set forth in *Celotex* and Fed.R.Civ.P. 56(c). Thus, summary judgment "should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979) (quoting *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION OF LAW

The material facts of this case are not in dispute for the purpose of ruling upon the defendant's motion for summary judgment. The issues in this case are whether the plaintiff's disability claim is covered under the Americans with Disabilities Act, that is, whether plaintiff's drug use qualifies him as an individual with a disability under the ADA, and if so, whether defendant failed to reasonably accommodate him.

The Fourth Circuit adjudicates ADA claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of disability discrimination under ADA, plaintiff must prove (1) he was a member of a protected class (he must have

a "disability," which is a physical or mental impairment that substantially limits one or more of the major life activities); (2) he suffered an adverse employment decision, (3) his performance met the employer's legitimate expectations at the time of the adverse action, and (4) the action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Ennis v. National Ass'n of Bus.and Educ. Radio, Inc.,* 53 F.3d 55 (4th Cir. 1995). Once plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to "rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] ... for a legitimate, nondiscriminatory reason." *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 196 (4th Cir.1997) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the defendant meets its burden of production, the presumption raised by the prima facie case is rebutted and plaintiff must bear the ultimate burden of showing that he was a victim of intentional discrimination. *Id.*

Defendant does not dispute that drug addiction may be a disability under the ADA. Defendant contends that plaintiff was not a "qualified individual with a disability" under the ADA because he was "currently engaging in the illegal use of drugs...." 42 U.S.C.A. § 12114 (1998).[8] Section 12114(a) of the ADA provides:

> For purposes of [the ADA], the term "qualified individual with a disability" shall not include any employee ... who

is currently engaging in the illegal use of drugs when the covered entity acts on the basis of such use.

The Equal Employment Opportunity Commission's Technical Assistance Manual on the ADA defines as follows the meaning of "current" drug use:

> Current drug use means that the illegal use of drugs occurred recently enough to justify an employer's reasonable belief that involvement with drugs is an ongoing problem. It is not limited to the day of use, or recent weeks or days, in terms of an employment action. It is determined on a case-by-case basis.

Equal Employment Opportunity Commission, Technical Assistance Manual on the Employment Provisions (Title I) of ADA § 8.3 (1992).

Even though Section 12114(b) of ADA provides "protection to persons who have sought rehabilitation and are no longer using drugs," this protection does not extent to the "use of drugs within a matter of days or weeks before the employment action is question." *Id.* Rather, Section 12114(a) applies to "the illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct." 29 C.F.R. § 1630.3 App. (1996). These provisions have been interpreted by the Third Circuit to "ensure that current use, even if it a natural consequence of an addiction disability, may be grounds for termination under the ADA". *Salley v. Circuit City Stores, Inc.,* 160

---

**8.** 42 U.S.C.A. § 12114 reads in part: Illegal use of drugs and alcohol. (a) Qualified individual with a disability. For purposes of this subchapter, the "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use. (b) Rules of Construction. Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who—

(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has

otherwise been rehabilitated successfully and is no longer engaging in such use;

(2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or

(3) is erroneously regarded as engaging in such use, but is not engaging in such use; except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

F.3d 977 (3rd Cir.1998) (citing cases in other circuits in which weeks and months prior to discharge were considered current use).

 In the Fourth Circuit, one year abstinence is not considered current use, *United States v. Southern Management Corp.*, 955 F.2d 914 (4th Cir.1992), while the use of illegal drugs during weeks and months prior to a discharge is considered current use. *Shafer v. Preston Memorial Hospital Corp.*, 107 F.3d 274 (4th Cir. 1997). Plaintiff alleges that because he was drug-free from the time of his admission to Talbott, on December 22, 1994, to the time of his discharge, on February 25, 1995, he was not currently using drugs, and thus he falls under the ADA. The Court disagrees. Even though the Fourth Circuit does not define "current use" in terms of a specific period of time, it has currently addressed the scope of the phrase currently engaging in the illegal use of drugs. *Id.* In *Shafer*, the Fourth Circuit found that "under the plain meaning of the [ADA and Rehabilitation Act] statutes, an employee illegally using drugs in a periodic fashion during weeks and months prior to discharge is 'currently engaging in the illegal use of drugs.'" *Shafer*, 107 F.3d at 278. The court in *Shafer* reasoned that "the legislative history makes plain Congress's intent that the broader meaning of 'currently' apply.'" *Id.* at 279. The Fourth Circuit further characterized the meaning of "current" as "a periodic or ongoing activity in which a person engages." *Id.* at 278.

Even after plaintiff tested positive for the use of fentanyl, he did not voluntarily come forward and admit he was a drug addict who needed rehabilitation. Rather, throughout defendant's investigation of plaintiff's involvement with fentanyl, plaintiff asserted to several individuals that he was not abusing drugs while also admitting that he has used fentanyl for experimental reasons. Thus, under ADA regulations, plaintiff can be considered as actively engaged in the use of illegal drugs. As in *Shafer*, plaintiff claimed that he was protected by the ADA because he was undergoing drug rehabilitation treatment. However, even though plaintiff was diagnosed as in early full remission, Sullivan recommended that plaintiff be placed in a "safe environment" with no access to drugs. In addition, PHCC also recommended that plaintiff be placed in a nonclinical setting without access to drugs. Both the recommendations of Sullivan and the PHCC demonstrated defendant's justified belief that plaintiff's use of fentanyl was an ongoing problem and that it was not safe for him to be around drugs. Therefore, under the Fourth Circuit analysis in *Shafer*, plaintiff was still a current user of drugs and not protected by the ADA. For these reasons, plaintiff failed to prove his prima facie case of disability discrimination under the ADA.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff in the present case was a current user of drugs within the meaning of the ADA when he was discharged by defendant and that defendant's motion for summary judgment (Documents # 25) should be granted.

The Court, therefore, **ORDERS**

1. That defendant's motion for summary judgment (Documents # 25) be **GRANTED**;

2. That there remaining nothing further to consider, this matter be **DISMISSED** and stricken from the Court's active docket.

The Clerk is directed to transmit copies of this Order to all counsel of record.